Christopher McEWEN, Appellant,

v.

STATE of Indiana.

No. 49S00–9612–CR–731.

Supreme Court of Indiana.

April 30, 1998.

Michael R. Fisher, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Carol A. Nemeth, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

Christopher McEwen was convicted of murder and sentenced to fifty-five years imprisonment. His direct appeal presents several issues for our review:

I. Did the trial court err when it refused to instruct the jury on reckless homicide and involuntary manslaughter?

II. Was "evidence of a previous battery" properly admitted?

III. Was the evidence sufficient to support the conviction?

We affirm. We also hold that Indiana Code § 35-37-4-14 is without effect because it sets forth standards for the admissibility of "evidence of a previous battery" that conflict with the Indiana Rules of Evidence.

## Factual and Procedural History

McEwen was convicted in this case of murdering his girlfriend, Tina Jackson. She died of a stab wound to the chest that was inflicted in front of their house in Indianapolis. Several witnesses testified to the circumstances of the killing. Because the first issue—refused instructions—requires a showing of a "serious evidentiary dispute," a detailed review of the evidence cited by McEwen is required.

*Officer Richard Weaver*

While on duty on the night of August 7-8, 1995, Indianapolis police officer Richard Weaver was directed to the residence of Jackson's brother to investigate a claim of a stolen vehicle. Jackson met Weaver in front of the house and told him that McEwen had stolen her car. Jackson also asserted that McEwen had stabbed her in the thumb, but she refused to show Weaver the injury and declined his offer to get medical attention. Weaver and Jackson then drove to the house she shared with McEwen a block away where McEwen met them at the door. Jackson entered to collect her clothing and immediately began arguing with McEwen. Weaver described the situation as follows:

I would say it was fairly hostile. They were arguing back and forth. Several times I had to interrupt them. They were cursing at each other. She was still at the time, going from room to room collecting her clothing. At one time, she went in the kitchen. He tried to prevent her from going in there. She forced her way by. I again separated the two parties. At that time, Mr. McEwen looked at me and stat-

ed if that police officer wasn't here, she——he again blocked her way from exiting the kitchen. She shoved him back. I again broke up the two parties. They continued to curse back and forth at each other.

McEwen next helped Jackson move some of her clothes and other items out to her car. Weaver ordered McEwen back into the house after he threw a portable stereo to the floor of the porch. Jackson eventually told Weaver that because her car would not start she would go on foot to her brother's nearby house.

Weaver left to investigate his next call but soon received a dispatch summoning him back to Jackson's house to investigate a report of a stabbing. When he arrived, he saw Jackson lying on the ground outside surrounded by several people. McEwen, who was in the house at that point, was quickly apprehended. Weaver noticed a "small laceration" on McEwen's face that was not there when Weaver first visited the house. After being taken into custody and read his *Miranda* rights, McEwen told police that he would explain what happened if his handcuffs were removed. Police became suspicious and searched him after he repeated this request several times. The search uncovered a kitchen cutting knife in McEwen's right front pocket. When McEwen saw the knife, he said: "How'd that get there." Although there was blood on the knife when it was recovered from McEwen, the knife was never tested for fingerprints or to determine whose blood it bore.

*Shawn Bowie*

Jackson's brother, Shawn Bowie, testified that Jackson came to his house on the night of the killing to use his phone to call the police because McEwen had taken her car and purse. Shortly after the call that summoned Officer Weaver for the first time, Bowie saw McEwen drive by in Jackson's car. Bowie assumed he was returning to the house around the corner that he shared with Jackson. Soon thereafter, Officer Weaver arrived in response to the first call and took Jackson back to her house. Jackson called Bowie a short time later asking him to assist her with her car still in the street in front of

the McEwen–Jackson residence. After Bowie concluded that the car would not start, Jackson gathered several items from the vehicle and yelled to McEwen, who was standing on their porch: "I'm getting ready to go call the police, you getting ready to go to jail. . . ." McEwen and Jackson began to argue and Bowie started walking back to his house. Bowie continued: "[T]hen I just seen [McEwen] come up, just come out and just swing at her, jab at her like that, two times." Jackson dropped her things and swung back at McEwen with a "Club" steering wheel anti-theft device. As McEwen retreated to his house, Bowie saw what he could "fairly tell" was a knife in his hand. Bowie ran to his sister and she cried out: "[H]e stabbed me." Bowie's precise distance from the quarrel at the time of the stabbing is unclear from the record. Jackson lay prostrate after the altercation until she was taken to a nearby hospital where she died about an hour later.

### Arlanda and Joseph Landers

Sixteen-year-old Arlanda Landers and her nineteen-year-old brother, Joseph, lived with their mother next door to Jackson and McEwen. Arlanda's testimony was neither internally completely consistent nor fully consistent with other accounts. She testified that she let Jackson use her telephone that night to call Bowie because Jackson's car would not start. Jackson then went back to her car and quickly became involved in an altercation with McEwen in the street. Arlanda first testified that she did not see anything that occurred, but next stated that McEwen struck Jackson in the back of the head with the Club device. Although Arlanda did not see the stabbing, she did testify that Jackson struck McEwen back (with what, if anything other than her fists, is unclear from Arlanda's testimony) and the two fought for possibly fifteen minutes. After the melee, McEwen returned to his house and Arlanda went outside to find that Jackson was in "bad" condition. Bowie soon appeared and the police were called. When asked whether Jackson said anything during the fight, Arlanda testified: "She was like stop, help and that's like she just blanked out." Under cross-examination, more inconsistencies appeared in Arlanda's account.

For example, she admitted that she had told police after the killing that she did not see the struggle.

Joseph Landers testified that he got home around midnight and saw that Jackson was using the telephone at his house. As Joseph worked on his car in front of his house, Jackson returned to her car and "there was like a loud noise like something metal hitting the ground" ten to fifteen minutes later. He next heard a "dragging" sound, possibly caused by a person being dragged across the ground, and saw Jackson lie down on her back in the Landers driveway. Bowie soon appeared and, after briefly examining Jackson, knocked on the door of the Landers house asking that someone call 911 because Jackson had been stabbed. Joseph then saw Jackson's stab wounds and waited with the others until emergency assistance arrived. It does not appear from Joseph's testimony that he observed any struggle between Jackson and McEwen.

### Christopher McEwen

Taking the stand in his own defense, McEwen gave a different account. He testified that he got home around midnight after having a few drinks with some friends. Bowie was on his way out the door and Jackson was gathering her things and appeared upset. McEwen and Jackson started arguing until Officer Weaver appeared and told McEwen that Jackson was planning to leave. McEwen testified he dropped the stereo on the porch because he was "upset." After Weaver left a few minutes later, McEwen helped Jackson move things to her car and repeatedly asked her what was "wrong." She eventually said that she was "sick" of him. McEwen grabbed her by the arm to get her attention and she "snatched" away from him. He then realized that Jackson had a knife and tried to take it from her. McEwen testified to what happened next: "We wrestled back and forth with the knife and we both fell to the ground. And, then after we fell, I got up and I had the knife. Tina got up to walk away and I asked her, I guess you're going to call the police again." McEwen put the knife in his pocket and went inside to treat scratches to his eye, hand, and

shoulder that he later assumed were received during the struggle. He conceded that Jackson was stabbed as they fought over the knife, but claimed that he had "no idea" how the stabbing occurred and did not learn until later that she was even injured. McEwen denied (1) trying to kill Jackson or trying to "stab" or "lunge at" her with the knife; and (2) hitting Jackson with the Club device or anything else that night. McEwen testified that he could not recall saying "how'd that get there" when the knife was found in his pocket or "if that police officer wasn't here" when Jackson was gathering her things in the house.

*Dr. Dean Hawley*

Dr. Hawley, a forensic pathologist, conducted Jackson's autopsy. He testified that he found two stab wounds—one in the chest and the other in the abdominal region—and no other injuries. Dr. Hawley described the abdominal wound as a "superficial injury" that would not have been fatal. Although he was unable to determine the precise depth of the chest wound due to surgery performed around the wound, he concluded that it penetrated at least two and one half inches and pierced the heart, causing Jackson's death. Dr. Hawley opined that the chest wound would have required "a great deal of force. The amount of force varies somewhat depending on how sharp the blade is and how easily penetrated the skin surface is. But it's amazingly difficult to stab into a body and a wound of this penetration through this part of the body, the front of the chest wall would require a great deal of force." Under cross-examination, he stated that after the knife pierced Jackson's chest, there would have been "less resistance in the internal organs than in the skin itself," and that "[i]t's impossible to tell" where Jackson or her adversary were positioned at the time she was stabbed.

*Rebuttal testimony*

Over McEwen's objection, the State was allowed to present rebuttal testimony to show intent to kill and absence of accident. Specifically, Shawn Bowie testified to an incident that he claimed occurred at McEwen's and Jackson's prior residence in Indianapolis three months before the killing. As Bowie looked on, McEwen and Jackson got into an argument that Jackson decided to end by driving Bowie home. As Jackson and Bowie drove away, McEwen fired at least two shots at the vehicle that struck a door and shattered a side window. After the shots were fired, Bowie saw McEwen standing with "smoke all around him" and a gun in his hand. Pictures illustrating damage to the car were admitted into evidence. Public defender Novella Nedeff, who represented McEwen after he was charged with criminal recklessness and carrying a handgun without a license as a result of the incident, testified on surrebuttal. She stated that Jackson told her around three months after the incident that the window shattered because McEwen threw a beer bottle at the car and that he fired no shots at her that day. The charges against McEwen from this incident were eventually dismissed.

**I. Refusal to Instruct on Lesser Included Offenses**

McEwen contends that the trial court erred when it refused to give his tendered instructions on *reckless homicide* and *involuntary manslaughter*. When asked to instruct the jury on lesser included offenses, trial courts are to apply the test set forth in *Wright v. State*, 658 N.E.2d 563 (Ind.1995). First, the court must determine whether the lesser offense is inherently or factually included in the crime charged. *Id.* at 566–67. If it is, the court should give the instruction if (1) there is a "serious evidentiary dispute" as to the element or elements distinguishing the greater from the lesser offense; and (2) in view of this dispute, the jury could conclude that the lesser offense was committed but not the greater. *Id.* at 567. In deference to trial courts' proximity to the evidence, we review the decision whether to instruct the jury on lesser included offenses for an abuse of discretion if the court makes a finding as to the existence or lack of a "serious evidentiary dispute" on the element in question. *Champlain v. State*, 681 N.E.2d 696, 700 (Ind.1997). However, in the absence of a finding on that point, we review the issue de novo. *Id.*[1]

---

1. For error to be predicated on failure to instruct the jury on a particular issue, the tendered in-

## A. *Reckless homicide*

■ Reckless homicide is an inherently included lesser offense of murder. *Wright,* 658 N.E.2d at 567. The only element distinguishing the two offenses is the defendant's state of mind: reckless homicide occurs when the defendant "recklessly" kills another human being and murder occurs when the killing is done "knowingly" or "intentionally." *Compare* IND.CODE § 35–42–1–5 (1993) *with* IND.CODE § 35–42–1–1(1) (1993).[2] Reckless conduct is action taken in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct. IND.CODE § 35–41–2–2(c) (1993). A person engages in conduct "knowingly" if the person is aware of a "high probability" that he or she is doing so. IND. CODE § 35–41–2–2(b) (1993). Accordingly, McEwen was entitled to an instruction on reckless homicide if there was a "serious evidentiary dispute" permitting the jury to find that he recklessly but not knowingly killed Jackson.

■ The colloquy on the reckless homicide instruction began with the trial court telling defense counsel: "I don't understand how you get to reckless." Defense counsel replied that the argument for reckless homicide was "pretty weak" if based on McEwen's testimony alone, but contended that "from the State's witnesses certainly the jury has the right to infer or to conclude that he did something reckless and still not find him guilty of knowingly." The court asked: "[B]ut if it was her knife and ... he took it away from her, how could that be reckless?" Counsel responded that McEwen could have taken the knife from Jackson "in a reckless manner" and, alternatively, if the jury credited Arlanda Landers's and Shawn Bowie's testimony, it could reach a verdict of reckless homicide. The court responded: "No, [counsel]. The Court disagrees with you. We will not be giving the reckless homicide." It does not appear that the *Wright* test was brought to the court's attention and it is unclear whether *Wright* as such was considered in deciding whether the jury would be instructed on lesser included offenses. In any event, the colloquy on reckless homicide reveals that the court considered the evidence to determine whether there was a factual dispute as to McEwen's intent. This is the point of the finding on "serious evidentiary dispute" that *Champlain* indicated would be given deference on appeal. Although not using the terminology of *Wright,* the court made the functional equivalent of a finding on the existence or lack of a serious evidentiary dispute as to McEwen's reckless behavior. Talismanic language is not required. We accordingly review the refusal to instruct on reckless homicide here for an abuse of discretion. *Champlain,* 681 N.E.2d at 700.

■ We agree with defense counsel's concession that the argument for reckless homicide based on McEwen's account alone was "pretty weak." The gist of McEwen's testimony was that the killing occurred somehow during the struggle, essentially by accident. He denied striking her at all that night; thus his version supported only death by accident, not reckless behavior, and the jury was instructed on accident in this case. Any reversible error hinges on the other evidence. Bowie testified that he saw McEwen twice "jab" or "swing" at Jackson and return to the house with a knife in his hand. In light of uncontradicted testimony that Jackson died of a stab wound that pierced her heart, the trial court reasonably concluded that Bowie's testimony showed only knowing or intentional not reckless conduct. Arlanda Landers testified that McEwen struck Jackson with the Club device and that the two fought for possibly fifteen minutes, but she also stated that she did not see the stabbing. In sum, the trial court was within its discretion in concluding that the evidence showed that one

struction must also correctly state the law and the substance of the instruction must not be covered by the instructions that were given. *See, e.g., Fields v. State,* 679 N.E.2d 1315, 1322 (Ind. 1997). Because the State does not contend that these additional criteria are not met here, we address only whether the evidence in the record supported instructions on reckless homicide and involuntary manslaughter.

2. The information in this case charged McEwen with "knowingly" killing Jackson. We accordingly do not explore whether he intentionally did so.

of two things occurred: (1) an accidental stabbing during the struggle (if McEwen's account is credited); or (2) a knowing or intentional killing (if Bowie's account is credited). Failure to instruct the jury on reckless homicide based on this evidence was not an abuse of discretion.

### B. *Involuntary manslaughter*

 Involuntary manslaughter occurs when the defendant kills another human being while committing or attempting to commit certain crimes that "inherently pose[ ] a risk of serious bodily injury." IND.CODE § 35–42–1–4 (1993). Battery—a knowing or intentional touching of another person in a rude, insolent, or angry manner, IND.CODE § 35–42–2–1 (1993 & Supp.1995)—can be among these. IND.CODE § 35–42–1–4 (1993). Involuntary manslaughter is not an inherently included lesser offense of murder. *Wright*, 658 N.E.2d at 569. It is factually included only if the charging instrument alleges that the offense was committed by one of the underlying crimes. *Id.* at 567. Involuntary manslaughter was factually included here because the information alleged that McEwen knowingly killed Jackson "by stabbing with a deadly weapon, that is: a knife, at and against the person of Tina Jackson, thereby inflicting mortal injuries upon Tina Jackson, causing Tina Jackson to die." The only element distinguishing murder from involuntary manslaughter is what the defendant intended to do—batter or kill. *Lynch v. State*, 571 N.E.2d 537, 539 (Ind.1991). If the evidence allowed the jury to find that McEwen killed Jackson while committing or attempting to commit battery, it was reversible error not to instruct the jury on involuntary manslaughter. *Wright*, 658 N.E.2d at 567.

 The trial court refused to give the instruction on the sole ground that McEwen sought instructions for what the court believed was an excessively wide range of lesser included offenses.[3] We emphasized in *Wright* and *Champlain* that the decision to instruct the jury on lesser included offenses turns on the evidence. This point

bears emphasis again today: McEwen was entitled to an instruction on involuntary manslaughter if the evidence, depending on how it was weighed, allowed the jury to convict of that offense. There is no abstract limitation on the number of lesser included offense instructions that may be given. Because the trial court made no finding as to the existence or lack of a serious evidentiary dispute with respect to involuntary manslaughter, we review the evidence de novo to determine whether failure to instruct the jury on that offense was error. *Champlain*, 681 N.E.2d at 700.

McEwen argued at trial that he was entitled to an involuntary manslaughter instruction because Arlanda Landers's and Shawn Bowie's testimony could support a finding of battery or attempted battery. We disagree. Although Arlanda Landers's testimony, if credited, established that McEwen battered Jackson with the Club device, this would not have supported an instruction on involuntary manslaughter because a different battery caused Jackson's death. *Elliott v. State*, 450 N.E.2d 1058, 1063 (Ind.Ct.App.1983) (battery underlying an involuntary manslaughter conviction must proximately cause the death). The evidence showed without contradiction that Jackson died of a stab wound that pierced her heart; thus the killing occurred "while committing" a stabbing, not "while committing" an assault with the Club device. IND.CODE § 35–42–1–4 (1993). Because Landers testified that she did not see the stabbing, her testimony is not helpful on this issue.

 Shawn Bowie testified that he saw McEwen twice "jab" or "swing" at Jackson, then retreat to his house with a knife in his hand, after which Jackson cried out "he stabbed me." Assuming arguendo that Bowie's account is correct, we would have to conclude that McEwen intended only to batter Jackson when he inflicted the stab wound in her chest. Whether instructions should be given on a lesser included offense necessarily depends on the facts of each case and we have often observed that it is prudent to give

---

3. Notwithstanding this concern, the trial court instructed the jury on voluntary manslaughter in this case.

the instruction if in doubt. *Champlain*, 681 N.E.2d at 701. Nonetheless, an assault like that Bowie described with a knife or similar sharp object—particularly to the chest or head region—rarely occurs without awareness of a high probability that death will result. This is a "knowing" killing amounting to murder; the assault cannot reasonably be found to be a mere "touching" of the victim and an instruction on involuntary manslaughter is properly refused. *Whipple v. State*, 523 N.E.2d 1363 (Ind.1988) (defendant hit his mother in the head and back several times with an ax); *Cardine v. State*, 475 N.E.2d 696 (Ind.1985) (defendant killed his girlfriend by stabbing her four times with a knife). In sum, Bowie's testimony presents no basis for finding anything other than a knowing or intentional killing.

In conceding that McEwen's testimony was "pretty weak" support for a reckless homicide instruction, defense counsel also stated that it was "even a weaker one for involuntary manslaughter." We agree. Because McEwen testified that he never hit Jackson on the night of her death—in substance a disclaimer of *any* criminal intent—his testimony is inconsistent with a finding that he intended only to batter Jackson. *Cf. Lynch*, 571 N.E.2d at 538–39 (jury should have been instructed on involuntary manslaughter where fatal gunshot initially entered victim through the arm and the defendant testified that he intended only to injure the victim). McEwen staked everything on a defense of accident. By unequivocally denying that he intended to injure Jackson in any way, he offered an alternative account of events that foreclosed any middle ground as to his intent. Accordingly, the trial court did not err when it refused to give McEwen's involuntary manslaughter instruction.

## II. Evidence of a Previous Battery

McEwen next argues that the trial court erred in allowing Shawn Bowie to testify on rebuttal that three months before the killing he saw McEwen fire several gunshots at a car driven by Jackson in which Bowie was a passenger. McEwen renews in this appeal the same objections he made to the admission of this evidence in the trial court: (1) Bowie's testimony was improperly admitted

for the sole purpose of allowing the jury to make the "forbidden inference" that he assaulted Jackson once, so he must have done so again (Indiana Evidence Rule 404(b)); and (2) any probative value of this evidence was substantially outweighed by the danger of unfair prejudice (Rule 403). The State responds that Bowie's testimony was admissible to show McEwen's motive, intent, and relationship with Jackson, and to rebut McEwen's account that the stabbing was an accident.

### A. Admissibility under the Indiana Rules of Evidence

Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

When the defendant objects to the admission of evidence on Rule 404(b) grounds, the following test is applied in deciding whether the challenged evidence is admissible: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Hicks v. State*, 690 N.E.2d 215, 221 (Ind.1997); *Thompson v. State*, 690 N.E.2d 224, 233 (Ind.1997). In sum, if the evidence bears on some issue other than criminal propensity and clears the balancing hurdle of Rule 403, it is admissible.

We dealt with substantively similar evidence recently in *Hicks*. In that case, the defendant was convicted of murdering his girlfriend. Like McEwen and Jackson, the parties had a relationship characterized in part, if not frequently, by conflict. The State was allowed to introduce evidence of the defendant's prior assaults on and confrontations with the victim. *Hicks* upheld the admission of this evidence on the ground that it showed the relationship between the parties and, more precisely, a "paradigmatic motive"

for committing the crime—hostility. *Hicks*, 690 N.E.2d at 222 (quoting *United States v. Russell*, 971 F.2d 1098, 1106–07 (4th Cir. 1992)). Hicks's hostility toward the victim bore on proving whether he killed her with the requisite criminal intent. The same is true here. Although there was ample evidence of hostility already in the record, Bowie's rebuttal testimony was relevant to show a pattern of hostility dating back before the night of the killing. This illustrated the depth of possible motive and was also relevant to assessing McEwen's claim that Jackson was stabbed accidentally. The next issue is whether Bowie's testimony should nonetheless have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. The prior incident occurred slightly more than three months before the killing, which is not too distant in time for the evidence to lose its probative force for the point offered. *Cf. id.* at 223 (evidence of assault on victim that took place more than three years before the crime charged was of "low probative value"). The risk of a "forbidden inference" here is reduced because the weapon was different from that allegedly used in the crime charged; there was no allegation in this case that a gun played any role in Jackson's death. Accordingly, the trial court was within its discretion in concluding that probative value outweighed any prejudice.

### B. *Indiana Code § 35–37–4–14*

McEwen alternatively contends that admission of Bowie's testimony was error because it was not admitted in accordance with a statutory requirement that applies in certain prosecutions when the State intends to offer "evidence of a previous battery." IND. CODE § 35–37–4–14 (1993). The statute requires the State to file a written motion, including a specific offer of proof, not less than ten days before trial. If the offer of proof is found to be "sufficient," the trial court "shall" order a hearing outside the presence of the jury in which the witness to the prior battery is available for questioning. § 35–37–4–14(d). At the end of the hearing, if the court finds the evidence to be admissible, it "shall make an order stating what evidence may be introduced ... and the na-

ture of the questions to be permitted." *Id.* McEwen objected to Bowie's testimony on the ground that he had not received notice in conformity with the statute. The trial court ruled that Bowie's testimony was admissible even though no pretrial hearing was held on its admissibility.

■ "Evidence of a previous battery" is defined to mean "a prior unrelated act of battery or attempted battery on the victim"—whether or not charges were filed concerning the act—that took place within five years before the commission of the crime charged. §§ 35–37–4–14(a)–(b). We agree with McEwen that Bowie's testimony alleged an attempted battery by McEwen and therefore was "evidence of a previous battery" within the meaning of the statute. Firing a gun at another but fortuitously missing the target is an attempted battery. *See, e.g., Henderson v. State*, 534 N.E.2d 1105 (Ind. 1989). This, however, is not the end of the inquiry. The State maintains that the Indiana Rules of Evidence, not the statute, control any requirement of pretrial notice. Indeed, the State ignored the statute in preparing for trial because it relied on Rule 404(b)'s provision that notice of intent to offer evidence of prior crimes, wrongs, or acts is not required unless the defendant requests advance notice. Because McEwen did not request notice in accordance with Rule 404(b), the State did not give it.

On the notice issue alone, there is no apparent conflict between Indiana Code § 35–37–4–14 and Rule 404(b). The latter does not foreclose a statutory requirement of notice to the defendant irrespective of any request for notice. Ind.Evidence Rule 101(a) (statutory law applies if rules of evidence do not cover a specific evidence issue). There is, however, a conflict between the Evidence Rules and the statute's substantive provisions governing the admission of evidence of a previous battery. Specifically, Indiana Code § 35–37–4–14(c) provides that "evidence of a previous battery is admissible into evidence in the state's case-in-chief for purposes of proving motive, intent, identity, or common scheme and design." This tracks some of the "other purposes" enumerated in the second sentence of Rule 404(b): "[Evi-

dence of other crimes, wrongs, or acts] may ... be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." The statute thus is consistent with Rule 404(b)'s prohibition on the introduction of other acts of misconduct to show criminal propensity. However, the statute does not require the balancing of prejudicial impact and probative value currently provided for in Rule 403. By prescribing that evidence of a previous battery "is admissible" for the listed purposes without consideration of possible prejudicial impact, Indiana Code § 35–37–4–14 would admit evidence not necessarily admissible under our rules of evidence.

Because the statute's substantive requirements for admissibility conflict with the Indiana Rules of Evidence, the statute is a nullity on that point: "The statute and the rule both address the admissibility of evidence and they create two different standards. In instances where such a conflict exists, the conflicting statute is nullified." *Humbert v. Smith*, 664 N.E.2d 356, 357 (Ind. 1996) (noting conflict between Rule 803(6) and Indiana Code § 31–6–6.1–8(b)) (citation omitted).[4] More precisely, when an Evidence Rule and a statute address the same subject matter, the Rule controls "[t]o the extent there are any differences." *Williams v. State*, 681 N.E.2d 195, 200 n. 6 (Ind.1997). Although this doctrine is ultimately based on separation of powers, *id.*, there is no conflict between the judicial and legislative branches because this result is also consistent with a clearly expressed legislative policy that any statute conflicting with procedural rules enacted by this Court "shall be of no further force or effect." IND.CODE § 34–5–2–1 (1993).

Accordingly, the only remaining question is whether the notice provision in subsection (d) may be severed from the rest of the statute. Because Indiana Code § 35–37–4–14 offers no guidance on this issue, we turn to the general severability statute. The General Assembly has provided that "every part and application of every statute is severable" unless "the remainder [of the statute] is so essentially and inseparably connected with, and so dependent upon, the invalid provision or application that it cannot be presumed that the remainder would have been enacted without the invalid provision or application." IND.CODE § 1–1–1–8(b) (1993). We conclude that subsection (d) cannot be severed from the rest of the statute because it is inseparably connected with the invalid subsections. Subsection (d) governs the admission of "evidence described in subsection (b)." Subsection (b), in turn, defines "evidence of a previous battery" and subsection (c) provides that "evidence of a previous battery" is admissible without consideration of possible prejudicial impact. In sum, the notice requirement in subsection (d) specifically applies only to the admission of evidence under the (invalid) standards for admissibility set forth in the rest of the statute; as such it falls with the invalid substantive provisions. Indiana Code § 35–37–4–14's notice provision therefore was not controlling with respect to pretrial notice when Shawn Bowie's rebuttal testimony was admitted.[5]

## III. Sufficiency of the Evidence

Finally, McEwen argues that there was insufficient evidence to prove that he knowingly killed Tina Jackson. In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the

---

**4.** *Brim v. State*, 624 N.E.2d 27, 33 (Ind.Ct.App. 1993) also held that Indiana Code § 35–37–4–14 was a nullity, reasoning that it conflicted with common-law evidence rules in force before the Indiana Rules of Evidence were adopted.

**5.** McEwen also argues that Bowie's rebuttal testimony was inadmissible because the State did not give notice of intent to offer this evidence in accordance with Rule 404(b). This contention is waived because McEwen rested on the statute in the trial court. A party may not object on one ground at trial and rely on a different ground on

appeal. *See, e.g., Jester v. State*, 551 N.E.2d 840, 843 (Ind.1990). Even if the claim were available now, it is meritless because Rule 404(b) requires a request by the defendant to trigger the notice provision. McEwen did not request advance notice from the State of intent to offer Rule 404(b) evidence in this case. Neither the State's general obligation to respond to defense discovery requests nor its specific obligation to give reasonable notice under Rule 404(b) is in any way affected by today's holding.

credibility of witnesses. The conviction will be affirmed if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Wooden v. State,* 657 N.E.2d 109, 111 (Ind.1995). Intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury. *Cate v. State,* 644 N.E.2d 546, 548 (Ind.1994). More precisely, a stabbing near the heart allows an inference of knowing or intentional killing. *Pointer v. State,* 585 N.E.2d 33, 35 (Ind.Ct.App.1992) (voluntary manslaughter conviction was supported by sufficient evidence where the defendant stabbed the victim "in the chest, near his heart, to a depth of several inches"). If credited, Bowie's eyewitness account and the uncontradicted physical evidence of a deep chest wound that pierced Jackson's heart established beyond a reasonable doubt that McEwen knowingly killed Jackson. We decline McEwen's invitation to second-guess the jury's apparent decision not to believe his account of events.

■ McEwen also maintains that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. For a claim of self-defense to prevail, the defendant must show that he (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. *Jordan v. State,* 656 N.E.2d 816, 817 (Ind.1995); *see also* IND.CODE § 35–41–3–2(a) (1993) (a person may use "reasonable force" against another to repel what the person "reasonably believes to be the imminent use of unlawful force"). When self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements. *Tunstill v. State,* 568 N.E.2d 539, 541 (Ind.1991). The jury was instructed on self-defense in this case. McEwen presumably hoped that the jury would conclude he acted in self-defense based on his claim that in the heat of argument he noticed that Jackson had a knife. However, there is no record support for the conclusion that offensive use of the knife against McEwen (assuming Jackson pos-

sessed it at all) was imminent. McEwen did not so testify and neither did the other witnesses. In addition, all the eyewitness testimony—including McEwen's—described McEwen as the initial aggressor and a willing participant in the violence. This also negates his claim of self-defense. The State proved beyond a reasonable doubt that McEwen did not act in self-defense.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.