## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Bradley Keffer
Keffer Hirschauer LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bryan Williams,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 25, 2020<br><br>Court of Appeals Case No.<br>19A-CR-862<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Shatrese Flowers, Judge<br><br>Trial Court Cause No.<br>49G02-1710-MR-39179 |

**Pyle, Judge.**

Bryan Williams ("Williams") appeals his conviction by jury of murder.[1] He argues that the trial court abused its discretion when it: (1) denied his motion for a continuance; (2) denied his motion for a mistrial; and (3) refused to give the jury his tendered lesser-included offense instructions. Concluding that the trial court did not abuse its discretion, we affirm the trial court's judgment.

We affirm.

## Issues

1. Whether the trial court abused its discretion when it denied Williams' motion for a continuance.

2. Whether the trial court abused its discretion when it denied Williams' motion for a mistrial.

3. Whether the trial court abused its discretion when it refused to give the jury Williams' tendered lesser-included offense instructions.

## Facts

The facts most favorable to the verdict reveal that on December 24, 2016, forty-three-year-old Williams and his long-time friend, forty-two-year-old Gerald Edwards ("Edwards"), went to Williams' sister's apartment in Noblesville. Williams and Edwards, who are both black, were intoxicated when they left the apartment at 9:25 p.m. in Williams' 2010 white Cadillac. As Williams left the apartment complex, he turned left onto State Road 38. A nearby business'

---

[1] IND. CODE § 35-42-1-1.

security camera captured an image of Williams' Cadillac entering a roundabout on State Road 38 at approximately 9:30 p.m. Immediately thereafter, Williams reached the intersection of State Roads 38 and 32.

A few minutes later, Angela ("Angela") and Corey Graff were approaching the intersection of State Roads 38 and 32 from the east. Angela noticed "an older model white Cadillac" parked on the side of the road. (Tr. Vol. 3 at 151). She also noticed two black men fighting on the opposite side of the road. According to Angela, "one guy was lying down on the ground . . . on his side and there was another guy standing on top of him hitting him." (Tr. Vol. 3 at 153). There were no other vehicles or people in the area. Angela called 911 to report what she had seen. While she was making the call, Angela saw the two men stand up and walk towards the Cadillac.

Noblesville Police Department Officers were dispatched to the scene and found a baseball cap, a ring, a bracelet, a charm, and drops of blood on the road near the intersection of State Roads 38 and 32. An officer took the items to the Noblesville Police Department property room and logged them in. DNA testing revealed that the DNA profile of the blood drops matched Williams' DNA profile. In addition, DNA profiles of skin cell samples taken from the baseball cap, the ring, and the bracelet matched Edwards' DNA profile. The charm was not tested for DNA.

In the meantime, Williams drove to a nearby neighborhood in the City of Lawrence. He eventually called 911 and told the dispatcher that Edwards was

not breathing. When emergency officials arrived at the scene, Edwards was dead. He had been stabbed nine times in his chest, back, and arm. The force used to inflict the wounds punctured his liver and his lungs and fractured one of his ribs. Williams had a contusion on the back of his head and a lacerated finger that was dripping blood. Officers subsequently found a knife, which contained Williams' DNA on the handle, in a nearby yard. A City of Lawrence Police Department officer collected the knife and checked it in to the City of Lawrence Property Room ("the property room").

[7] In a police statement immediately following Edwards' death, Williams told City of Lawrence Police Department Captain Mark Osborn ("Captain Osborn") that when he left his sister's apartment in Noblesville, he had turned right onto State Road 38 and then left onto State Road 37. According to Williams, several white men in a dark truck with bright LED headlights had begun following his car. Williams explained that when he had turned left onto 126th Street, the truck had continued to follow him until he had stopped just west of Cumberland Road. Williams stated that he had attempted to wave the truck around him, but Edwards had jumped out of the Cadillac and had run over to the truck. Williams further stated that Edwards had become involved in a fight with a white man with a beard who had jumped out of the truck. According to Williams, when he had attempted to assist Edwards, another of the truck's occupants had hit Williams in the head. Williams further explained that he and Edwards had gotten back into the Cadillac and had driven away.

According to Williams, it was only later that he had discovered that Edwards had been stabbed.

[8] Later that night, a police officer and Williams drove the route that Williams claimed he and Edwards had taken. Williams told the officer to stop where he claimed the fight had occurred on 126th Street. However, the officer found no evidence of a fight at that location. The following day, police officers blocked off 126th Street from State Road 37 to Cumberland Road in an attempt to find evidence of the fight. The officers found nothing. In addition, they learned that at the time Williams claimed that the fight had occurred, 126th Street had been backed up with traffic because of a popular Christmas light display. None of the officers that had been directing traffic at the light display had seen a fight on 126th Street that night.

[9] Police officers arrested Williams in October 2017. During a police interview with Williams at the time of his arrest, Captain Osborn suggested that Williams and Edwards had become involved in a verbal dispute in the car. According to Captain Osborn, Williams had stopped the car near the intersection of State Roads 38 and 32, and Edwards had gotten out. Captain Osborn speculated that at some point, the two men had become involved in a physical altercation, which Angela had witnessed. Captain Osborn further suggested that when Edwards had Williams down on the ground, Williams had pulled out a knife and had stabbed Edwards nine times. Thereafter, according to Captain Osborn, Williams had driven around the City of Lawrence neighborhood until Edwards had died from his injuries and had then called 911. Williams denied the

captain's version of events and maintained his story that he and Edwards had been attacked by white men in a dark truck. Later in the interview, Williams conceded that since he had been intoxicated, he could have been mistaken about the location of the altercation with the men in the truck.

[10] The State charged Williams with murder the following day. The charging information alleged that "[o]n or about December 24, 2016, BRYAN WILLIAMS did knowingly or intentionally kill another human being, to-wit: Gerald Edwards." (App. Vol. 2 at 33).

[11] In November 2017, the State filed a notice of discovery compliance stating that it had sent Williams several Marion County Crime Lab reports, including the DNA analyst's initial report. The DNA analyst's second report was sent to Williams in April 2018. At a final pre-trial conference in December 2018, Williams told the trial court that he was prepared for the trial that was scheduled to begin later that month. The December 2018 trial was subsequently continued to March 2019 because of court congestion.

[12] In February 2019, Williams filed a motion to continue the March 2019 trial so that he could "request that the DNA recovered from the alleged murder weapon be retested by an independent lab." (App. Vol. 2 at 134). The motion acknowledged that the trial had already been continued four times, once by the State, twice by Williams, and once due to court congestion. However, the motion further explained that the independent lab could not complete the testing before the March 2019 trial. The trial court denied the motion.

[13]    At a pre-trial hearing ten days before the March 2019 trial, Williams asked the trial court to reconsider its denial of his motion to continue. The trial court explained its denial as follows: "This case has some age, and this case has previously been set and I looked at the history in this case[.] I believe [this case has also been] congested. So, it has some age. And so because of the age that is why the court denied the request to continue." (Tr. Vol. 2 at 8-9). Although the trial court denied the motion to continue, it issued an order authorizing the retesting of the DNA recovered from the handle of the knife. After the trial court issued this order, it was discovered that the lab's previous testing had depleted the DNA sample taken from the knife and that there was no DNA available to retest.

[14]    The five-day trial began as scheduled on March 4, 2019. At the end of the third day of trial, Captain Osborn testified that the Noblesville Police Department had released to him, on December 26, 2016, the evidence found near the intersection of State Roads 38 and 32. This evidence, which included the hat, the bracelet, the ring, the charm, and blood samples taken from the road, had been placed in unsealed envelopes. Captain Osborn testified that he had sealed the envelopes with the City of Lawrence's evidence tape and checked them into the property room. According to Captain Osborn, the only people who had access to the property room were the property room attendant, Elizabeth Pierson ("Pierson"); the Captain who oversaw her; and the individual in charge of keys in the controller's office. Captain Osborn further explained that it was Pierson's responsibility to take the evidence to the Marion County Crime Lab

for testing and then to pick it back up and return the items to the property room after the testing had been completed.

[15] At the beginning of the fourth day of trial, Pierson testified that she had previously worked in the property room and had transported sealed envelopes containing evidence in the case to the crime lab for testing. She testified that she had transported some of the envelopes to the crime lab in December 2016 and had picked them up in March 2017. She had also transported some of the envelopes to the crime lab in May 2017 and had picked them up in July 2017.

[16] During a break in trial that afternoon, defense counsel told the trial court that a retired City of Lawrence police officer had contacted him that day. The officer told counsel that Pierson had been terminated from the City of Lawrence in January 2018 for being intoxicated on the job and that there were issues related to her mishandling evidence in the property room. Defense counsel asked for the opportunity to cross-examine Pierson about the allegations and for a mistrial.

[17] The State responded that it had learned late the previous night that Pierson no longer worked in the property room because there had been an issue with her drinking on the job. However, the State claimed that it was not aware of any issue regarding Pierson mishandling evidence. In addition, the State claimed that Captain Osborn had told it that there had been an audit of the property room but that nothing had been out of order. The State also pointed out that there had been no indication that Pierson had tampered with the evidence in

this case. Rather, the State noted that Captain Osborn had sealed the envelopes and "[t]he only thing that [Pierson] did in this entire thing was literally drive the items from Lawrence to the Marion County Crime Lab to be tested." (Tr. Vol. 5 at 168).

[18] The trial court told the parties that it would send the jurors to lunch and allow the parties time to research the issue. Following the break, the parties returned to the courtroom for a hearing outside the presence of the jury. At that hearing, City of Lawrence Police Department Captain of Professional Standards Erika Schneider ("Captain Schneider") testified that Pierson had come to work intoxicated in January 2018. Pierson had been immediately suspended and had never returned to work. Captain Schneider further testified that Pierson had not handled any evidence in the property room that day. The captain also explained that there had been five audits in the property room since May 2017, and that no issues with the evidence had been discovered during the audits. City of Lawrence Police Department Captain of Operations Timothy Steele also testified that Pierson had not handled any evidence in the property room the afternoon that she had been intoxicated.

[19] At the end of the hearing, Williams asked the court to declare a mistrial because he had not been aware of the circumstances of Pierson's termination and he had had no opportunity to cross examine her with respect to her credibility. The State responded that Williams had not been placed in grave peril. Specifically, the State pointed out that the incident with Pierson had happened in January 2018, six months after she had last handled the evidence in this case. There had

been no evidence presented that Pierson had been impaired or had mishandled evidence in January, March, May or July 2017 when she had transported the evidence to and from the crime lab.

[20] The trial court denied Williams' motion for a mistrial but allowed him to question Pierson outside the presence of the jury. Pierson explained that before the incident in January 2018, she had been dealing with personal issues for two to three weeks. She thought she might have gone to work drunk or hungover "a few times, but not as significant as it was that time." (Tr. Vol. 5 at 208). The night before the January 2018 incident, she had drunk alcohol throughout the night without sleeping. She had also taken a double dose of her prescription anti-anxiety medication as well as her son's ADHD medication. Pierson further explained that she had not been drinking and had not been hungover in May 2017 or July 2017 when she had transported the evidence in Williams' case to the crime lab and then back to the property room. She also testified that she had never tampered with or mishandled evidence while working for the Lawrence Police Department and that she specifically had not tampered with or mishandled the evidence in this case.

[21] Thereafter, Williams made an oral motion to suppress any evidence that Pierson "would have touched or been involved in in the chain of custody." (Tr. Vol. 5 at 221). Assuming that motion was denied, Williams asked the trial court to allow him to question Pierson in front of the jury about her termination and inquire about exact dates that she had come to work after consuming alcohol the night before.

The trial court agreed to allow Williams to question Pierson in front of the jury. Pierson testified that she had been terminated because she was intoxicated at work in January 2018. She also testified that she not been intoxicated at work on any of the dates that she had transported the evidence in Williams' case to the crime lab.

Williams did not testify at trial. However, the jury watched a video of Williams' October 2017 interview with Captain Osborn.

Following the presentation of evidence, Williams tendered to the trial court lesser-included offense instructions for battery, reckless homicide, voluntary manslaughter, and involuntary manslaughter as well as a self-defense instruction. The State objected to all the instructions, and the trial court refused to give the lesser-included offense instructions. The trial court did, however, give the self-defense instruction.

The jury convicted Williams of murder, and the trial court sentenced him to fifty-eight (58) years in the Department of Correction. Williams now appeals his conviction.

# Decision

## 1. Motion for a Continuance

Williams first argues that "the trial court abused its discretion by failing to grant Williams a reasonable continuance and Williams was prejudiced as a result." (Williams' Br. 22). Specifically, he contends that the trial court should have

granted his motion for a continuance so that he could retest the DNA recovered from the knife handle.

[27] The denial of a non-statutory request for a continuance is committed to the trial court's discretion.[2] *Schmid v. State*, 804 N.E.2d 174, 177 (Ind. Ct. App. 2004), *trans. denied*. An abuse of discretion occurs when the ruling is against the logic and effect of the facts and circumstances before the court. *Tharpe v. State*, 955 N.E.2d 836, 843 (Ind. Ct. App. 2011), *trans. denied.* Under this standard, this Court will only consider the evidence favorable to the trial court's ruling and the reasonable inferences to be drawn therefrom. *Kelley v. State*, 825 N.E.2d 420, 424 (Ind. Ct. App. 2005).

[28] We further note that continuances to allow more time for trial preparation are generally disfavored in criminal cases. *Id.* The appellant must overcome a strong presumption that the trial court properly exercised its discretion. *Evans v. State*, 855 N.E.2d 378, 386 (Ind. Ct. App. 2006), *trans. denied*. Additionally, the appellant must make a specific showing of how he was prejudiced as a result of the trial court's denial of his motion. *Id.* at 386-87.

[29] Here, our review of the evidence reveals that the State sent Williams the DNA analyst's first report in November 2017 and her second report in April 2018.

---

[2] A "defendant is statutorily entitled to a continuance where there is an 'absence of material evidence, absence of a material witness, or illness of the defendant, and the specially enumerated statutory criteria are satisfied.'" *Gibson v. State*, 43 N.E.3d 231, 236 (Ind. 2015) (quoting *Elmore v. State*, 657 N.E.2d 1216, 1218 (Ind. 1995)) (citing IND. CODE § 35-36-7-1)). Here, Williams makes no claim that he was statutorily entitled to a continuance.

Further, in December 2018, Williams told the trial court that he was prepared for the trial that was scheduled later that month. Two months later, Williams filed a motion for a continuance so that he could retest the DNA found on the murder weapon. The trial court denied the motion based on the age of the case, which had already been continued four times, once by the State, twice by Williams, and once due to court congestion. Based on these facts and circumstances, the trial court did not abuse its discretion in denying Williams motion.

We further note that Williams cannot make a specific showing of prejudice. Specifically, after the trial court denied the motion, it was discovered that the lab's previous testing had depleted the DNA sample taken from the knife, and that there was no DNA available to retest. We find no error.

### 2. Motion for a Mistrial

Williams also argues that the trial court abused its discretion when it denied his motion for a mistrial. The trial court is best situated to decide whether to grant or deny a motion for a mistrial because it is in the best position to assess the impact of an event on the jury. *Myers v. State*, 887 N.E.2d 170, 189 (Ind. Ct. App. 2008), *trans. denied*. Declaring a mistrial is a drastic remedy and will occur only if there is no other remedy. *Id.* Denial of a motion for a mistrial will be reversed only upon a showing of an abuse of discretion. *Id.* The defendant must demonstrate that he was placed in a position of grave peril to which he

should not have been subjected and that no other action by the trial court could have remedied the perilous situation. *Id.*

[32] Williams contends that he was entitled to a mistrial because the prosecutor engaged in misconduct. We review a claim of prosecutorial misconduct in two steps. *Booker v. State*, 773 N.E.2d 814, 817 (Ind. 2000). First, we determine whether the prosecutor engaged in misconduct. *Id.* Then we determine whether the misconduct placed a defendant in a position of grave peril to which he should not have been subjected. *Id.* The gravity of the peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014).[3]

[33] Here, Williams claims that the prosecutor engaged in misconduct when she failed to tell him that Pierson had been terminated from her employment in January 2018 after she went to work intoxicated. Even if the prosecutor had engaged in misconduct, Williams was not placed in grave peril. Specifically, our review of the evidence reveals that the trial court allowed Williams to question witnesses in a hearing outside the presence of the jury and to question

---

[3] Typically, to preserve a claim of prosecutorial misconduct, the defendant must request an admonishment to the jury at the time the misconduct occurs. *Jerden v. State*, 37 N.E.3d 494, 498 (Ind. Ct. App. 2015). Failure to do so results in waiver of the issue on appeal and requires the defendant to establish not only the grounds for prosecutorial misconduct but also that the prosecutorial misconduct constituted fundamental error. *Id.* Here, where Williams' allegation of misconduct did not occur in front of the jury, the admonishment requirement was not practical. We therefore proceed directly to the substance of his claim.

Pierson in front of the jury. Pierson testified that one day, six months after she had handled the sealed evidence in this case, she had gone to work intoxicated. According to Pierson, she had done nothing more than transport the sealed evidence in this case back and forth from the property room to the lab. She also testified that she had neither tampered with nor mishandled the evidence in this case. Further, there is no evidence to the contrary. After hearing this testimony, the trial court determined that a mistrial was not warranted. We find no abuse of the trial court's discretion.[4]

## 3. Lesser-Included Offense Jury Instructions

Lastly, Williams argues that the trial court abused its discretion when it denied his tendered lesser-included offense instructions for reckless homicide, voluntary manslaughter, and involuntary manslaughter. In *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995), the Indiana Supreme Court set forth a three-part test that trial courts should perform when called upon by a party to instruct the jury on a lesser-included offense to the crime charged. First, the trial court must compare the statute defining the crime charged with the statute defining the

---

[4] Williams also argues that the trial court should have granted his motion for a mistrial "or a more meaningful remedy" because the State committed a discovery violation when it failed to advise him that Pierson had been terminated from her employment after she went to work intoxicated. (Williams' Br. at 31). Trial courts are given wide discretionary latitude in discovery matters and their rulings will be given deference on appeal. *Williams v. State*, 714 N.E.2d 644, 649 (Ind. 1999). The remedy for a discovery violation for an untimely disclosure is a continuance, and Williams failed to ask for one. Further, absent clear error and resulting prejudice, the trial court's determination of violations and sanctions will be affirmed. *Id.* Based on Pierson's testimony, the trial court determined that a mistrial was not warranted. We find no abuse of the trial court's discretion.

alleged lesser-included offense to determine if the alleged lesser-included offense is inherently included in the crime charged. *Id.* Second, if the trial court determines that an alleged lesser-included offense is not inherently included in the crime charged under step one, then it must determine if the alleged lesser-included offense is factually included in the crime charged. *Id.* at 567. If the alleged lesser-included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser-included offense. *Id.* Third, if a trial court has determined an alleged lesser-included offense is either inherently or factually included in the crime charged, "it must look at the evidence presented in the case by both parties" to determine if there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of the this dispute, a jury could conclude that the lesser offense was committed but not the greater. *Id.* It is reversible error for a trial court not to give a requested instruction on inherently or factually included lesser offenses if there is such an evidentiary dispute. *Id.* We now apply this framework to the tendered lesser-included offense instructions in this case.

## A.    Reckless Homicide

Reckless homicide is an inherently included lesser offense of murder. *Id.* The only element distinguishing the two offenses is the defendant's state of mind. *Id.* Reckless homicide occurs when the defendant "recklessly" kills another human being. IND. CODE § 35-42-1-5. Reckless conduct is action taken in plain, conscious, and unjustifiable disregard of harm that might result. IND.

CODE § 35-41-2-2(c). In addition, the disregard involves a substantial deviation from acceptable standards of conduct. *Id*.

[36] Murder, on the other hand, occurs when the killing is done "knowingly" or "intentionally." IND. CODE § 35-42-1-1. A person engages in conduct "knowingly" if the person is aware of a high probability that he is doing so. IND. CODE § 35-41-2-2(b). Accordingly, Williams was entitled to an instruction on reckless homicide if there was a serious evidentiary dispute permitting the jury to find that he recklessly but not knowingly killed Edwards. *See McEwen v. State,* 695 N.E.2d 79, 85 (Ind. 1998).

[37] Here, our review of the evidence reveals that Williams stabbed Edwards in the chest nine times with enough force to puncture his liver and lung and to break a rib. Stabbing a victim multiple times in the chest is evidence of an awareness of a high probability that the victim will be killed. *See id*. (explaining that "an assault . . . with a knife or similar sharp object – particularly in the chest or head region – rarely occurs without awareness of a high probability that death will result"). Based on this evidence, there was no serious evidentiary dispute permitting the jury to find that Williams recklessly, but not knowingly, killed Edwards. *See id*. Accordingly, the trial court did not abuse its discretion when it refused to give the jury Williams' tendered instruction on the lesser-included offense of reckless homicide.

**B.    Voluntary Manslaughter**

[38]   Voluntary manslaughter is a lesser-included offense of murder, differing only in the presence of sudden heat, which is a mitigating factor. *Watts v. State,* 885 N.E.2d 1228, 1231 (Ind. 2008). Sudden heat is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection. *Dearman v. State*, 743 N.E.2d 757, 760 (Ind. 2001). The crime of voluntary manslaughter thus "involves an 'impetus to kill' which arises 'suddenly.'" *Suprenant v. State*, 925 N.E.2d 1280, 1283 (Ind. Ct. App. 2010) (quoting *Stevens v. State*, 691 N.E.2d 412, 427 (Ind. 1997)), *trans. denied*. An instruction on voluntary manslaughter is supported if there exists evidence of sufficient provocation to induce passion that renders a reasonable person incapable of cool reflection. *Dearman*, 743 N.E.2d at 760 .

[39]   Because the distinguishing feature between the two offenses is the presence of sudden heat, Williams would only be entitled to an instruction on voluntary manslaughter if there was sufficient evidence of sudden heat for the jury to conclude that voluntary manslaughter was committed but not murder. *See Anderson v. State*, 681 N.E.2d 703, 710 (Ind.1997). However, our review of the record reveals no such evidence. Rather, the only evidence surrounding the altercation between the two men is that they fought at the side of the road, and Williams stabbed Edwards nine times. Accordingly, Williams was not entitled to an instruction on voluntary manslaughter, and the trial court did not err in refusing to give one.

### C.   Involuntary Manslaughter

[40]     Involuntary manslaughter is not an inherently included lesser offense of murder. *Norris v. State*, 943 N.E.2d 362, 368 (Ind. Ct. App. 2011), *trans. denied*. Murder and involuntary manslaughter are distinguished by the defendant's intent. *Wilson v. State*, 765 N.E.2d 1265, 1271 (Ind. 2002). Murder requires an intent to kill, whereas involuntary manslaughter requires an intent to batter. *Evans v. State*, 727 N.E.2d 1072, 1081 (Ind. 2000). Involuntary manslaughter is a factually lesser-included offense if the charging information alleges that a battery accomplished the killing. *Norris*, 943 N.E.2d at 368.

[41]     Here, the charging information alleges that "[o]n or about December 24, 2016, BRYAN WILLIAMS did knowingly or intentionally kill another human being, to-wit: Gerald Edwards." (App. Vol. 2 at 33). Because the charging information did not allege a battery, involuntary manslaughter is not a factually lesser-included offense of murder in this case. *See Champlain v. State*, 681 N.E.2d 696, 702 (Ind. 1997). Therefore, the trial court did not err in refusing to give an involuntary murder instruction.

[42]     We further note that even if the charging information had supported the instruction, the facts of the case do not. Specifically, Williams stabbed Edwards nine times with enough force to puncture his liver and lung and to break a rib. He then drove around a northeast side Indianapolis neighborhood until Edwards died before he called 911. The intent to kill can be inferred from the use of a deadly weapon in a manner likely to cause death or serious bodily injury. *Mauricio v. State*, 683 N.E.2d 1329, 1331 (Ind. Ct. App. 1997). The manner in which this crime was committed leads only to the inference of an

intent to kill. *See id*. Accordingly, the trial court did not abuse its discretion in refusing to give Williams' tendered involuntary manslaughter instruction.

Affirmed.

Robb, J., and Mathias, J., concur.