## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 30 2015, 9:03 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Darrell Dewayne Carter, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 30, 2015 <br><br> Court of Appeals Case No. 02A03-1403-CR-108 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Frances C. Gull, Judge <br><br> Cause No. 02D04-1305-FA-19 |

**Kirsch, Judge.**

[1] Following a jury trial, Darrell Dewayne Carter was convicted of Class A felony burglary,[1] Class C felony disarming a law enforcement officer,[2] and Class A misdemeanor resisting law enforcement.[3] After the jury reconvened, Carter was found to be a habitual offender.[4] The trial court sentenced Carter to an aggregate sentence of eighty-nine years executed with the Indiana Department of Correction. Carter appeals his convictions and sentence, raising the following issues:

> I. Whether the State presented sufficient evidence to support Carter's convictions for burglary and disarming a law enforcement officer;
>
> II. Whether the trial court erred in refusing Carter's request to give a lesser-included-offense jury instruction for burglary as a Class C felony;
>
> III. Whether the trial court abused its discretion by allowing the State to proceed with a habitual offender enhancement, which Carter claims was belatedly filed; and
>
> IV. Whether his eighty-nine year sentence is inappropriate in light of the nature of the offense and the character of the offender.

[2] We affirm in part, reverse in part, and remand with instructions.

---

[1] *See* Ind. Code § 35-43-2-1(2).

[2] *See* Ind. Code § 35-44.1-3-2.

[3] *See* Ind. Code § 35-44.1-3-1.

[4] *See* Ind. Code § 35-50-2-8. We note that, effective July 1, 2014, these statutes were amended; however, because Carter committed the offenses in 2013, we apply the statutes in effect at that time.

## Facts and Procedural History

[3] On May 3, 2013, Captain William Corn, with the Fort Wayne Police Department ("FWPD"), responded to a burglar alarm at the Botanical Garden Conservatory ("Conservatory") in Fort Wayne, Indiana. FWPD Detective Brent Roddy also responded to the alarm. Once at the Conservatory, Captain Corn, who was in uniform, and Detective Roddy, who was in plain clothes with a badge on his belt, checked the outside of the building, but found no signs of forced entry. Robert Anspach, a Conservatory employee, arrived at the scene and escorted the officers inside the building to check for an intruder. Anspach told the officers that no one was supposed to be in the building. Upon entering the Magnolia Room, the men heard a metallic banging sound, which Anspach said was not normal. Anspach and Captain Corn continued through the Conservatory, and Detective Roddy maintained his watch in the Magnolia Room, which was a common exit for the building.

[4] Soon thereafter, Detective Roddy heard someone coming, and when Carter entered the room, Detective Roddy had his firearm in a "low ready" position. *Tr.* at 191.[5] Carter did not have permission to be inside the Conservatory. When Detective Roddy saw that it was not Captain Corn, he raised his service firearm to a "high ready" position and "[g]ave [Carter] very loud verbal

---

[5] The record before us contains volumes of three separate proceedings. We will cite to the trial transcript as "*Tr.*," the habitual offender hearing transcript as "*Supp. Tr.*," and the sentencing hearing transcript as "*Sent. Tr.*"

commands, stop, police, get on the ground." *Id*. at 192. The men were about twenty to thirty feet away from each other. *Id*. at 218. Carter, moving toward Detective Roddy, "closed the distance faster than [Detective Roddy] could react, [Carter] then latched on top of [Detective Roddy's] service weapon." *Id*. at 192. In the struggle, the magazine was released from Detective Roddy's gun and fell to the floor. Detective Roddy continued to give Carter "verbal commands to get away from me, let go of my gun, get on the ground." *Id*. at 193.

[5] Captain Corn, upon hearing Detective Roddy shout "Police! Get on the ground. Get on the ground," ran back to the Magnolia Room to help. *Id*. at 119-20, 193. The Magnolia Room was well lit, and Captain Corn could see Carter struggling with Detective Roddy. He could also see Detective Roddy's gun magazine on the floor. Detective Roddy had a grip on his pistol, and Carter, who was holding the barrel as it pointed in his direction, still had both of his hands on Detective Roddy's gun. *Id*. at 120.

[6] Captain Corn "moved in and gave a front kick to [] Carter. And that was enough that [Carter] disengaged and backed off a little bit." *Id*. at 121. Captain Corn "tried to direct [Carter] to the ground, . . . [but Carter] just stood there looking about." *Id*. At some point, Captain Corn holstered his gun, "moved in," grabbed Carter by his lapels, "[t]ried to pull him down, and put some knee strikes on him." *Id*. Carter, who was eighty to one hundred pounds heavier than Captain Corn, did not budge." *Id*. at 121-22. Captain Corn could not

maintain his grip, and Carter "just turned" around and "went through the door." *Id*. at 121.

[7] Captain Corn and Detective Roddy pursued Carter outside the Conservatory, but temporarily lost sight of him when Carter jumped over a fence and attempted to hide in some underbrush. As Captain Corn was getting ready to go over the fence, he noticed that "the end of [his] left hand, his ring finger[,] was just dangling." *Id*. at 122. Upon being discovered in the underbrush, Carter climbed onto the roof of a covered walkway next to the Conservatory and then jumped nearly forty-five feet down into a drainage ditch. Carter was apprehended by other officers who had responded to the scene. Captain Corn was transported to a nearby hospital where he learned that the tendon had detached at the last joint of his finger, causing a condition called "[h]ammer finger." *Id*. at 125. Detective Roddy, who had remained at the scene, was able to identify Carter as the person who had broken into the Conservatory. Inside the Conservatory, officers found several damaged door frames, tools that were "apparently used in the break in," and a safe with a screwdriver sticking out of it. *Tr*. at 157-61; *State's Exs*. 7-19. Later, officers found pry marks on a door leading into the Conservatory from a courtyard. *Tr*. at 158; *State's Ex*. 6.

[8] On May 9, 2013, the State charged Carter with: Count I, Class A felony burglary resulting in bodily injury; Count II, Class C felony disarming a law enforcement officer; Count III, Class D felony resisting law enforcement; and Count IV, Class A misdemeanor resisting law enforcement. On January 21, 2014, the State filed a notice of intent to add a habitual offender enhancement

to the charging information.  Also on that date, the State filed a motion to dismiss Count III.  Following a hearing, the trial court granted the State's motion to dismiss Count III and allowed the State to add a habitual offender enhancement.  *Supp. Tr.* at 11.[6]  Carter did not request a continuance; in fact the trial judge specifically asked him if it was his "decision to proceed to trial [the next day]."  *Id.* at 13.  To which Carter responded, "Yes."  *Id.*

[9]  A two-day trial commenced on January 29, 2014.  During the second day of trial, and out of the presence of the jury, counsel discussed the final jury instructions.  Specifically, Carter requested that the trial court give the jury an instruction on Class C felony burglary as a lesser-included offense of Count I.  The trial court denied the request.  Final instructions were read, and after deliberations, the jury returned verdicts of guilty on the remaining three counts.  The jury was reconvened on the habitual offender phase and found Carter to be a habitual offender.

[10]  Following a sentencing hearing, the trial court sentenced Carter to fifty years for the burglary, enhanced by a term of thirty years for being a habitual offender, eight years for disarming a law enforcement officer, and one year for resisting law enforcement.  The trial court ordered all sentences to run consecutively to each other, for an aggregate sentence of eighty-nine years

---

[6] The Supplemental Transcript contained the testimony from a hearing on January 28, 2014.  The State's request to file a habitual offender enhancement against Carter was the only issue before the trial court on that day.

executed with the Department of Correction. Carter now appeals his convictions and sentence.

## Discussion and Decision

## I. Sufficiency of the Evidence

[11] On appeal, Carter contends that there was insufficient evidence to support his convictions for Class A felony burglary resulting in bodily injury and Class C felony disarming a law enforcement officer. Upon a challenge to the sufficiency of evidence to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses; instead, we respect the exclusive province of the trier of fact to weigh any conflicting evidence. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005); *Toney v. State*, 961 N.E.2d 57, 58 (Ind. Ct. App. 2012). We consider only the probative evidence supporting the verdict and reasonable inferences drawn therefrom, and we will affirm if that evidence and those inferences could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Toney*, 961 N.E.2d at 58.

[12] Indiana Code section 35-43-2-1 provides, "[a] person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary, a Class C felony." Burglary is elevated to a Class A felony if it results in "bodily injury" or "serious bodily injury" to "any person other than the defendant." Ind. Code § 35-43-2-1(2). Therefore, to convict Carter of Class A felony burglary, the State had to prove that he broke and entered the Conservatory, with intent to commit a felony therein, and that the burglary

resulted in bodily injury or serious bodily injury to one other than Carter. Indiana Code section 35-31.5-2-29 defines "bodily injury" as "any impairment of physical condition, including physical pain."

[13] Carter "concedes that, based upon the evidence presented, a reasonable trier of fact could have found [him] guilty of a Class C felony burglary." *Appellant's Br.* at 13. Instead, he contends that "it was unreasonable for the jury to find him guilty of Class A felony burglary because there was insufficient evidence that the burglary resulted in injury to Captain Corn's finger." *Id.* at 13-14. During trial, Captain Corn testified that he "grabbed [Carter] by his lapels," and injured his finger "when [he] engaged in [sic] Mr. Carter." *Tr.* at 121, 122. In describing the injury to his finger, Captain Corn further stated, "It has a slight dip to it, and always will. It doesn't quite bend as far as the other, but it works for the most part. It's pretty stiff every day." *Id.* at 126.

[14] Carter argues that Captain Corn's claim that he was injured when he grabbed Carter's lapels is not plausible because Carter "had no lapels for Corn to grab." *Appellant's Br.* at 14. Additionally, he asserts that, at trial, he vehemently denied ever being grabbed by Captain Corn and that his "rendition is far more plausible." *Id.* Captain Corn injured his finger on the day in question. It was for the factfinder to decide whether it believed Carter's version that Captain Corn never grabbed him and, therefore, could not have injured his hand as a result of the burglary, or Captain Corn's version that he hurt his hand when he tried to restrain Carter. We must decline Carter's invitation to reweigh the evidence and judge witness credibility. *Bass v. State*, 947 N.E.2d 456, 461 (Ind.

Ct. App. 2011), *trans. denied*. The State presented sufficient evidence from which a reasonable factfinder could have concluded that the burglary of the Conservatory resulted in Captain Corn's injury.

[15] To convict Carter of Class C felony disarming a law enforcement officer, the State had to prove that Carter knew that Detective Roddy was a law enforcement officer and that Carter knowingly or intentionally took or attempted to take Detective Roddy's firearm without his consent and while Detective Roddy was engaged in his official duties. Ind. Code § 35-44.1-3-2(b). The evidence most favorable to the verdict was that Detective Roddy was engaged in his official duties when he responded to a burglar alarm and thereafter searched the Conservatory for an intruder. Detective Roddy was in plain clothes; however, testimony revealed that Detective Roddy wore his badge on his belt. Upon seeing Carter enter the Magnolia Room, Detective Roddy "[g]ave [Carter] very loud verbal commands, stop, police, get on the ground." *Tr.* at 192. Captain Corn confirmed that Detective Roddy announced that he was a police officer and testified that, when he heard Detective Roddy shout "Police! Get on the ground. Get on the ground," Captain Corn ran to the Magnolia Room to help. *Id.* at 119-20, 193. The Magnolia Room was well lit, and Captain Corn could see Carter struggling with Detective Roddy. He could also see Detective Roddy's gun magazine on the floor. Detective Roddy had a grip on his pistol, and Carter, who was holding the barrel as it pointed in his direction, still had both of his hands on Detective Roddy's gun. *Id.* at 120.

[16] Carter contends that there is insufficient evidence to convict him of Class C felony disarming a law enforcement officer because he did not know that Detective Roddy, who was wearing plain clothes, was a law enforcement officer. Carter maintains that he did not see Detective Roddy's badge and had already grabbed the gun by the time Detective Roddy had verbally identified himself as an officer. *Appellant's Br.* at 15. Further, Carter asserts that, because there was no evidence that he disarmed Detective Roddy, the only question is whether he attempted to do so. *Id*. Carter offers that, due to his physical size, any effort to disarm Detective Roddy would have resulted not in just an attempt, but, instead, in a completed act. Accordingly, Carter requests that we find that the evidence was insufficient to sustain Carter's conviction for disarming a law enforcement officer.

[17] Carter's argument, equating his failure to disarm Detective Roddy with a lack of attempt, is not supported by the evidence. At trial, Captain Corn, Detective Roddy, and Carter admitted that Carter had his hands on Detective Roddy's gun. *Tr.* at 120, 192, 245. Carter even admitted that he "had to hold onto the gun because [Detective Roddy was] telling him to let go of his gun," and Carter was afraid Detective Roddy was going to shoot him. *Id*. at 247. There was sufficient evidence that Carter, regardless of the reasons, was attempting to take Detective Roddy's gun. On appeal, Carter reiterates the argument he made at trial regarding his lack of knowledge that Detective Roddy was a law enforcement officer. During his testimony in his case-in-chief, Carter argued that he did not know Detective Roddy was an officer until after he had grabbed

the gun. *Id.* at 242. In fact, Carter maintained that it was not until after Captain Corn entered the Magnolia Room, and Carter saw his police uniform, that Carter realized, "man, this dude [Detective Roddy] is a cop." *Id.* at 247. Carter's argument on appeal is a request that we reweigh the evidence and judge witness credibility; again, we must decline Carter's invitation. *Bass*, 947 N.E.2d at 461. The State presented sufficient evidence from which a reasonable factfinder could have concluded that Carter knew that Detective Roddy was a law enforcement officer and that Carter knowingly or intentionally took or attempted to take Detective Roddy's firearm without his consent while Detective Roddy was engaged in his official duties. *See* Ind. Code § 35-44.1-3-2(b).

## II. Jury Instruction as to Lesser Included Offense

[18] A conviction for Class A felony burglary requires the State to prove that a person broke and entered the building or structure of another with intent to commit a felony therein, and that the burglary resulted in bodily injury to one other than the defendant. Ind. Code §35-43-2-1(2). Carter contends that the trial court erred by denying his request that the jury receive an instruction on the lesser-included offense of Class C felony burglary, *i.e.*, that he merely broke and entered a building or structure with intent to commit a felony therein.

[19] To determine whether a trial court should have given a lesser-included instruction, we must apply the three-part test established by our Supreme Court in *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995). *Coy v. State*, 999 N.E.2d

937, 944 (Ind. Ct. App. 2013). First, we must "compare the statute of the crime charged with the statute of the lesser-included offense to determine if the lesser-included offense is included in the crime charged." *Id*. (citing *Watts v. State*, 885 N.E.2d 1228, 1231 (Ind. 2008) (citing *Wright*, 658 N.E.2d at 566)). "Second, if the alleged lesser-included offense is not inherently included in the charged crime, the Court must compare the statute defining the alleged lesser-included offense with the charging information to determine if all elements of the alleged lesser-included offense are covered by the allegations in the charging instrument." *Id*. at 943-44. "Third, if a trial court has determined that an alleged lesser-included offense is either inherently or factually included in the crime charged, it must look at the evidence presented in the case by both parties." *Wright*, 658 N.E.2d at 567. "If there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense." *Id*. "If the evidence does not so support the giving of a requested instruction on an inherently or factually included lesser offense, then a trial court should not give the requested instruction." *Id*. If a trial court makes a factual finding regarding the existence or lack of a "serious evidentiary

dispute," we review that decision for an abuse of discretion.[7] *Champlain v. State*, 681 N.E.2d 696, 700 (Ind. 1997).

[20] Here, at the close of trial and outside the presence of the jury, Carter's attorney asked that she be permitted to tender a lesser-included instruction of burglary as a Class C felony, noting that the "only difference is the additional element of injury." *Tr.* at 302. While conceding that "there's no dispute . . . at all about the elements of the C felony," she asserted, "I do believe that there is a serious evidentiary dispute . . . concerning the additional element of causing the injury." *Id.* at 302, 303. The State argued that Captain Corn had a finger injury after he responded to the burglary, which had not existed prior to the burglary. Therefore, there was no serious evidentiary dispute about whether the burglary resulted in bodily injury to Captain Corn.

[21] The trial court agreed with Carter that Class C felony burglary is an inherently lesser included offense of Class A felony burglary and, therefore, noted that the question was whether there was a serious evidentiary dispute that the burglary resulted in bodily injury. Setting out the evidence, the trial court said:

> Captain Corn testified that he injured his finger when he had his initial encounter with the Defendant, when I grabbed his lapels or shirt. The Defendant's testimony that he was never grabbed or touched by Captain Corn is in conflict with that, but I don't believe that it is a

---

[7] "If the trial court makes no ruling as to whether a serious evidentiary dispute exists, *Wright* implicitly requires the reviewing court to make this determination *de novo* based on its own review of the evidence." *Champlain v. State*, 681 N.E.2d 696, 700 (Ind. 1997).

serious evidentiary dispute that the officer was injured during the course of the Burglary, . . . I don't find that there is a serious evidentiary dispute as to the injury that the officer suffered from it . . . .

*Id*. at 304-05. The trial court denied Carter's motion to instruct as to the lesser included offense after specifically finding that there was no evidentiary dispute.

[22] Both parties agree that part one and two of the three-part test are satisfied where, like here, burglary as a Class C felony is inherently a lesser-included offense of burglary resulting in bodily injury, a Class A felony. *Appellant's Br*. at 19; *Appellee's Br*. at 17; *see Green v. State*, 523 N.E.2d 403, 404 (Ind. 1988) (burglary, as Class C felony "was necessarily included in" burglary resulting in bodily injury). The parties disagree, however, regarding part three, i.e., whether there is a serious evidentiary dispute whether Captain Corn suffered bodily injury as a result of Carter's burglary.

[23] Captain Corn testified that he was chasing Carter out of the Conservatory, and was getting ready to go over a fence, when he put his hand up and saw the end of the ring finger on his left hand was just dangling. *Tr*. at 122. When asked how he injured his finger, Captain Corn testified, "When I engaged in [sic] Mr. Carter." *Id*. Detective Roddy testified that, after Captain Corn came to his aid in the Magnolia Room, he could see Captain Corn holding Carter and trying to get him to the ground. *Id*. at 195. Detective Roddy testified that, after Carter was caught, Captain Corn was complaining about his hand and Detective Roddy could see that Captain Corn's finger looked "very bad." *Id*. at 204. The State introduced Exhibits 1 through 4, which showed the injury to Captain Corn's finger.

[24] "In deference to trial courts' proximity to the evidence, we review the decision whether to instruct the jury on lesser included offenses for an abuse of discretion if the court makes a finding as to the existence or lack of a 'serious evidentiary dispute' on the element in question." *McEwen v. State*, 695 N.E.2d 79, 84 (Ind. 1998). Here, Captain Corn said that the injury to his finger occurred when he grabbed Carter's lapels. Carter denied that he was ever touched by Captain Corn. Although the trial court recognized this conflict in the testimony, it determined this conflict did not rise to the level of a serious evidentiary dispute regarding the question of whether burglary resulted in bodily injury to Captain Corn. Based on this record, we cannot say that the trial court abused its discretion in finding that there was no serious evidentiary dispute that the burglary resulted in bodily injury to Captain Corn.

## III. Habitual Offender Enhancement

[25] Carter argues that it was error for the trial court to grant the State's belated amendment to add a habitual offender enhancement. Indiana Code section 35-34-1-5(e) sets forth the deadline by which the State must file an amendment to include a habitual offender enhancement; however, it also permits the State to file a habitual-offender charge at any time before the commencement of trial "upon a showing of good cause." Ind. Code § 35-34-1-5(e). We begin by noting that Indiana Code section 35-34-1-5(e) was amended on July 1, 2013 to change the deadline for adding a habitual offender enhancement. Prior to the amendment, a request for a habitual offender enhancement had to be filed "not later than ten (10) days after the omnibus date." After the amendment, a

request for a habitual offender enhancement had to be filed "within thirty (30) days of the trial date." Here, during the hearing on the State's notice of intent to file a habitual offender count, Carter maintained that the statute in effect prior to July 1, 2013 was applicable to this case. *Supp. Tr.* at 7. The State argued that the statute that took effect on July 1, 2013 applied. Because the State concedes that its filing was untimely under both versions, we need not address the question of which version applies. *Id.* at 9.

[26] On January 21, 2014, the State belatedly filed a notice of intent to add a habitual offender enhancement to the charging information. The trial court initially set a hearing on the State's notice of intent for January 24, 2014, but rescheduled the hearing to January 28, 2014 on its own motion. During the hearing, the State argued that the habitual offender enhancement had been part of plea negotiations from the very start. *Id.* at 3. The State explained that it had engaged in plea negotiations with Carter's prior counsel and had given the defendant a window of time during which he could plead guilty, and the State would recommend a sentence cap of forty years. If Carter refused this plea deal, the State said it would file a habitual offender count that would increase his sentence exposure to around eighty years. *Id.* at 4. A rift in the relationship between Carter and his original counsel led to the appointment of new counsel, Michelle Kraus. *Id.* The State offered Kraus the same plea deal for Carter and extended the deadline for Carter's response. *Id.* Kraus had difficulty obtaining access to her client and asked for additional time to discuss the plea with Carter. Just prior to trial, Carter determined that he was not interested in pleading

guilty, and the State filed its intention to file a habitual offender enhancement. Following the hearing, the trial court, presumably finding good cause for the belated filing, granted the State's request to add a habitual offender enhancement to the Class A felony burglary count. *Id*. at 11. Carter did not request a continuance; in fact the trial judge specifically asked Carter if it was his "decision to proceed to trial [the next day]," and Carter responded, "Yes." *Id.* at 13.

[27] Carter argues that it was error for the trial court to grant the State's belated amendment to add a habitual offender enhancement. Specifically, Carter observes, "There was no specific written finding by the trial court that the State had made a showing of good cause to permit the ultra-belated filing." *Appellant's Br*. at 24. "Further, there was no showing that Carter, himself, agreed to and/or waived the late filing." *Id*. The State counters, "Carter waived any challenge [to] the belated filing of the habitual offender enhancement because he did not preserve the error by requesting a continuance." *Appellee's Br*. at 18. The State contends that, waiver notwithstanding, there was good cause for the belated filing where Carter knew that the "habitual offender enhancement was part of the plea negotiations from the beginning of Carter's case," and such filing was made only after Carter refused the State's plea. *Appellee's Br*. at 12. We agree with the State that Carter waived any challenge to the belated filing of the habitual offender enhancement when he did not request a continuance.

[28]     In *White v. State*, 963 N.E.2d 511, 518 (Ind. 2012), our Supreme Court discussed key Indiana cases addressing late filings under Indiana Code section 35-34-1-5(e), recognizing that "[e]ach case presented a unique set of facts related to the tardy habitual-offender filing." *White*, 963 N.E.2d at 515. Of particular relevance to the facts before this court are the cases of *Kidd v. State*, 738 N.E.2d 1039 (Ind. 2000) and *White*, itself.

[29]     In *Kidd*, the State belatedly filed a habitual offender enhancement, forty-nine days after the omnibus date and twenty days before the scheduled trial date. 738 N.E.2d at 1041. Kidd did not request a continuance. *Id*. On appeal, Kidd argued that the trial court erred in permitting the State to file an information charging him as a habitual offender because it was untimely filed and there was no showing of good cause. *Id*. Kidd also suggested that he was prejudiced because the delay caused him to be inadequately prepared for additional witnesses called during the habitual offender phase and that he should not have been forced to forfeit his right to a speedy trial in order to meet the State's untimely filing. *Id*. at 1041-42. *Id*. Our Supreme Court found that Kidd had waived this issue for appellate review, reasoning:

> In the recent decision of *Williams v. State*, 735 N.E.2d 785 (Ind. 2000), this Court . . . reiterate[ed] the rule "that once a trial court permits a tardy habitual filing, an appellant must move for a continuance in order to preserve the propriety of the trial court's order for appeal." *Id*. at 789 (citing *Daniel v. State*, 526 N.E.2d 1157, 1162 (Ind. 1988); *Haymaker v. State*, 667 N.E.2d 1113, 1114 (Ind. 1996)). There is no exception to this rule even where a defendant has asked for a speedy trial. *Haymaker*, 667 N.E.2d at 1114. If the defendant indeed needs additional preparation time, then he may seek a continuance of the

habitual offender phase of the proceedings without affecting his rights to a speedy trial on the main charge. *Williams*, 735 N.E.2d at 789.

*Kidd*, 738 N.E.2d at 1042. Our Supreme Court did not address Kidd's contention of lack of "good cause."

[30] In *White*, the State did not articulate any grounds for good cause in its written motion requesting permission to belatedly file the habitual-offender enhancement. 963 N.E.2d at 517. There was no hearing on the State's motion, and the trial court never made an explicit finding of good cause when it granted the State's motion. *Id*. At the initial hearing on the habitual-offender charge, the issue of good cause was not explored. *Id*. On the other hand, White never objected or responded to the State's motion to file the habitual-offender charge. *Id*. White neither requested a continuance nor expressed any issue with the tardy filing at the initial hearing on the charge. *Id*. White also failed to raise the issue during trial." *Id*. Accordingly, our Supreme Court determined that White had waived for appellate review the issue of the belated filing.

[31] Like the defendants in *Kidd* and *White*, we find that, under the facts of this case, the issue of the belated filing has not been preserved for appellate review. As our Supreme Court clarified in *White*, "[Our Supreme] Court's precedent has consistently held that a defendant must request a continuance after a trial court permits a tardy habitual-offender filing to preserve the issue for appeal." This

rule, as stated in *Kidd* and *White*, "has no exceptions." *White*, 963 N.E.2d at 518; *Kidd*, 738 N.E.2d at 1042.[8]

## IV. Sentence

[32] We now turn to Carter's argument that his eighty-nine-year executed sentence is inappropriate. Under Indiana Appellate Rule 7(B), "we may revise any sentence authorized by statute if we deem it to be inappropriate in light of the nature of the offense and the character of the offender." *Corbally v. State*, 5 N.E.3d 463, 471 (Ind. Ct. App. 2014). The question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate. *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). It is the defendant's burden on appeal to persuade the reviewing court that the sentence imposed by the trial court is inappropriate. *Chappell v. State,* 966 N.E.2d 124, 133 (Ind. Ct. App. 2012), *trans. denied.*

[33] Carter's Class A felony burglary conviction subjected him to imprisonment for a fixed term of between twenty and fifty years. Ind. Code § 35-50-2-4. The habitual offender finding enhanced the sentence for his Class A felony by an additional thirty years. Ind. Code § 35-50-2-8(h). Carter's Class C felony

---

[8] Consistent with *White* and *Kidd*, we do not address the merits of whether the trial court found "good cause" for the belated filing. In *White*, 963 N.E.2d at 518, our Supreme Court commented:

Importantly, the defendant in *Kidd* argued that there was no finding of good cause, but this Court did not reach that argument after finding waiver. We believe this conclusion comports with the general waiver principle that "[a] party may not sit idly by and permit the court to act in a claimed erroneous matter [sic] and then attempt to take advantage of the alleged error at a later time." *Hensley v. State*, 251 Ind. 633, 639, 244 N.E.2d 225, 228 (1969).

disarming a law enforcement officer conviction subjected him to imprisonment for a fixed term of between two and eight years. Ind. Code § 35-50-2-6(a). Finally, Carter's Class A misdemeanor resisting law enforcement conviction subjected him to a fixed term of punishment of up to one year. Ind. Code § 35-50-3-2.

[34] Here, the trial court's sentence was entirely within the range allowed by statute. The trial court sentenced Carter to the maximum executed sentences for each of his convictions: fifty years for the burglary conviction enhanced by thirty years for the habitual offender finding; eight years for the disarming a law enforcement officer conviction; and one year for the resisting law enforcement conviction. The trial judge ordered that these sentences run consecutively to each other for an aggregate sentence of eighty-nine years. Carter, however, insists that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Appellant's Br.* at 28. We agree.

[35] "When considering the nature of the offense, the advisory sentence is the starting point to determine the appropriateness of a sentence." *Johnson v. State*, 986 N.E.2d 852, 856 (Ind. Ct. App. 2013) (citing *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007)). Carter's Class A felony burglary conviction carried an advisory sentence of thirty years. Ind. Code § 35-50-2-4. The habitual offender finding enhanced the sentence for his Class A felony by an additional thirty years. Ind. Code § 35-50-2-8(h). Carter's Class C felony disarming a law enforcement officer conviction carried an advisory sentence of four years. Ind. Code § 35-50-2-6(a). Carter's Class A

misdemeanor resisting law enforcement conviction carried an advisory sentence of up to one year. Ind. Code § 35-50-3-2. Because there was more than one victim, it was not inappropriate to run the offenses consecutively to each other. *See Estes v. State*, 827 N.E.2d 27, 29 (Ind. 2005) (Estes committed offenses against two victims, so at least one consecutive sentence was appropriate). These advisory sentences add up to an aggregate sentence of sixty-five years; this is the starting point to determine the appropriateness of Carter's sentence. *Johnson*, 986 N.E.2d at 856.

[36] Regarding the nature of the offense, Carter focuses on the burglary. Burglary is elevated from a Class C felony to a Class A felony if that burglary results in bodily injury to one other than the defendant. Ind. Code § 35-43-2-1. On the night in question, Carter was forty-six years old, homeless, and riding a borrowed bicycle. Earlier that same evening, Carter had entered the Conservatory and had taken some food and bottled water. Carter left the Conservatory and rode to Lewis and Hannah Streets to "hang out" and eat until it got dark enough so he could return and sleep inside the Conservatory because he did not want to sleep "under the bridge." *Tr.* at 238. The Conservatory was a non-residential building. When Carter entered the Conservatory for the second time, it was 9:00 p.m., he was unarmed and wearing flip flops. *Id.* at 249. Upon being discovered in the Conservatory, Carter attempted to take Detective Roddy's service pistol and wrestled with Captain Corn while the officers tried to arrest him. Carter was able to get away and fled outside. At the time of his arrest, Officer Jon Bonar of the FWPD

noted that Carter "had no shoes on." *Id*. at 147. Furthermore, while we recognize that Captain Corn injured his finger during his encounter with Carter, none of the testimony suggested that Carter inflicted this injury intentionally. In fact, Captain Corn, himself, testified that he grabbed Carter by his lapel and tried to pull him down, but Carter did not budge. *Id*. at 121. When Captain Corn could not hold on, Carter just turned and "went through a door." *Id*.[9] This is the contact that resulted in the injury to Captain Corn's finger.

[37] As to Carter's character, he acknowledges that he has an extensive criminal history, yet he emphasizes that none of his four juvenile adjudications involved violence, and of the remaining twenty-one misdemeanor convictions and ten felony convictions, three convictions were for misdemeanor battery, one was for felony sexual battery, and the remaining convictions could "be fairly categorized as property, driving, and substance offenses." *Appellant's Br*. at 27. Carter's characterization of his past does not fully capture the extensive nature of his criminal history. Carter has been committing criminal offenses since 1993. Included among the offenses are convictions for Class B felony burglary, Class C felony burglary, Class C felony forgery, Class D felony sexual battery,

---

[9] During the sentencing hearing, the State offered the testimony of Detective Roddy who testified that Carter's act of disarming him had resulted in Detective Roddy being diagnosed with "post-traumatic stress disorder." *Sent. Tr*. at 7. On appeal, however, neither party cites to Detective Roddy's testimony in its discussion of the appropriateness of Carter's sentence.

Class D felony theft, and numerous counts of receiving stolen property, each as a Class D felony. *Appellant's App.* at 112-17.

[38] That being said, in light of the fact that Carter's prior convictions consisted almost exclusively of Class C and Class D felonies and that his sentence will include the imposition of a thirty-year habitual offender enhancement, we find the nature of the instant offenses and Carter's character do not warrant a maximum sentence. Here, the eighty-nine-year sentence was inappropriate. Therefore, we revise Carter's sentence to the advisory sentence, consisting of thirty years for the Class A felony burglary conviction, enhanced by thirty years for being a habitual offender; four years for the Class C felony disarming a law enforcement officer conviction; and one year for the Class A misdemeanor resisting law enforcement conviction. We order these sentences to be served consecutively to one another, for an aggregate executed sentence of sixty-five years. We remand this case to the trial court with instructions to enter a sentence of sixty-five years executed. In all other respects, we affirm the decision of the trial court.

[39] Affirmed in part, reversed in part, and remanded with instructions.

Friedlander, J., and Crone, J., concur.