# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 16 2016, 8:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

ATTORNEY FOR APPELLANT

Charles W. Lahey
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

---

## IN THE
# COURT OF APPEALS OF INDIANA

---

Isaiah Samelton,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 16, 2016

Court of Appeals Case No.
71A03-1509-CR-1589

Appeal from the St. Joseph Superior Court

The Honorable Jane Woodward Miller, Judge

Trial Court Cause No.
71D01-1407-F1-2

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Isaiah Samelton (Samelton), appeals his conviction for attempted murder, a Level A felony, Ind. Code §§ 35-42-1-1; -41-5-1; and aggravated battery, a Level 3 felony, I.C. § 35-42-2-1.5(2).

[2] We affirm.

## ISSUES

[3] Samelton raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion in admitting certain evidence; and

(2) Whether the trial court abused its discretion by not instructing the jury on Samelton's proposed jury instruction offering attempted voluntary manslaughter as a lesser included offense to the attempted murder charge.

## FACTS AND PROCEDURAL HISTORY

[4] During the evening hours of July 9, 2014, Antonio Garcia (Garcia) was working as a cashier at the Phillips 66 gas station located at the corner of Western Avenue and Falcon Street in South Bend, Indiana. Willie Menyard (Menyard), a patron at the store, was prepaying for his gas. At about that time, a red sedan drove into the pump area and, without stopping, drove to the front of the store entrance. An individual inside the car pointed a gun out of the driver's side window and began firing. As Menyard was exiting the store, a bullet struck him in his back and exited out of his right arm. The red sedan then turned around, drove back into the pump area where the customer vehicles

remained parked, and fired more shots. The vehicle circled around the pump area before speeding off. The patrons outside the gas station ran for cover.

[5]     Garcia called the police. Also, the Shot-Spotter system—a gunshot detection, alert and analysis tool that incorporates sensors to detect, locate, and alert law enforcement agencies of illegal gunfire incidents in real time—notified the police. Four bullet fragments and seventeen fired casings were left at the scene. Officer Greg Howard (Officer Howard) of the South Bend Police Department got the description of the red car and its suspects after reviewing the store surveillance videos and started searching the surrounding area. Driving on Meade Street, Officer Howard located the suspected red sedan parked on the sidewalk. After watching the car for a couple of minutes, he saw two male individuals enter the vehicle, and drive south on Meade Street toward Western Avenue. When the red sedan crossed Western Avenue, Officer Howard initiated a traffic stop. Samelton was identified as the driver. A male, later identified as Juwan Jones (Jones), exited the vehicle from the passenger's side and ran through an alley. During the foot pursuit, Officer Howard saw an object, later identified as a semiautomatic handgun, fall from Jones' person. The handgun contained a loaded magazine. The following day, a K-9 officer found another semiautomatic handgun along the route where Jones had fled. A magazine was also found nearby. Each of the semiautomatic handguns matched the casings and the bullet fragments left at the gas station. The fired casings were both on the west and east sides of the gas station's property. Garcia's car, which was parked on the west side parking lot, sustained damage

from three bullet holes. Also, a gas pump and a dumpster sustained bullet damage.

[6] On July 11, 2014, the State filed an Information, charging Samelton with Count I, attempted murder, a Level 1 felony; and Count II, aggravated battery, a Level 3 felony. Samelton's jury trial commenced on August 25, 2015. Among the evidence introduced and admitted were the two semiautomatic firearms, bullet fragments, and casings recovered from the gas station, the gas station's surveillance videos[1], and Exhibit 101, a map image showing the approximate location of each of the twenty-three shots fired at the gas station. Exhibit 101 also included a large circle representing a twenty-five meter margin of error. Samelton argued, in part, that the margin of error would essentially place each gunshot anywhere in the circled area, and consequently "have no assurance that shot number 1 wasn't really taken from location number 22 or that 21 was taken from location number 2[.]" (Transcript p. 273). After hearing Samelton's arguments, and the testimony on how the Shot-Spotter system works, the trial court overruled Samelton's objection and admitted Exhibit 101 into evidence.

[1] The record shows that the surveillance videos were admitted as Exhibit 2, however, they were submitted with Jones' appeal, and therefore were unavailable for Samelton's appeal.

[7] At the close of the evidence, Samelton requested the trial court to instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder. The trial court refused to tender the instruction, finding that there was no appreciable evidence of sudden heat. At the close of trial, the jury found Samelton guilty as charged. On September 23, 2015, the trial court sentenced Samelton to concurrent sentences of thirty years for his attempted murder conviction and nine years for his aggravated battery conviction.

[8] Samelton now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Admission of Evidence*

[9] We review the admission of evidence for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). Indiana Evidence Rule 702 governs the admissibility of testimony by expert witnesses. It provides that:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand or to determine a fact in issue.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

[10] The trial court acts as a gatekeeper when determining the admissibility of opinion evidence under Rule 702. *Estate of Borgwald v. Old Nat'l Bank*, 12 N.E.3d 252, 257 (Ind. Ct. App. 2014). "The proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles." *Doolin v. State*, 970 N.E.2d 785, 787 (Ind. Ct. App. 2012). "In determining whether scientific evidence is reliable, the trial court must determine whether the evidence appears sufficiently valid, or, in other words, trustworthy, to assist the trier of fact." *Id*. at 788.

[11] Samelton seems to challenge the accuracy of Exhibit 101, arguing that because there was a twenty-five meter margin of error using the Shot-Spotter system, there was no way of decoding the accurate location of each of the twenty-three bullets fired at the gas station.

[12] Paul Greene (Greene), the lead forensic analyst at SST Inc.—the company that developed and manufactures the Shot-Spotter system—testified that he had written close to 600 forensic reports on shooting incidents and given testimony in court thirty-six times. He stated that the purpose of the Shot-Spotter system is to "simply provide law enforcement agencies, rapid notification that a weapon has been fired within their jurisdiction, or at least within the sensory area." (Tr. p. 255). Greene explained the science behind the Shot-Spotter system stating, in relevant part:

> The [Shot-Spotter] system is an acoustic gunshot detection system. It is comprised of three separate parts. The first being the sensors. [] It has a processor board. It has a memory. It has a GPS receiver, and it also has a radio modem that allows network communication back to

the location of the server. The location server is the second part of the system, and it's a software application that gathers all of the information that is sent [] by different sensors. It matches pulses from different sensors and then is able to locate the origin of a gunshot incident, whether single shot or multiple shots. It then reports that information to the user interface. The user interface is the third portion of it. We call that the [] investigator portal or the alert console which resides on the operator's desktop or laptop computer. It is where they receive the alerts.

(Tr. pp. 243-44). Greene testified that the Shot-Spotter system notifies law enforcement agencies within sixty seconds of any gunfire, and "they get a dot on the map indicating the latitude and longitude of where that incident happened, and they also get a street address." (Tr. p. 256). There are sixty-five sensors installed in South Bend, and six of those sensors detected the gunfire. Greene identified Exhibit 101 as an aerial map of the gas station with twenty-three superimposed bullseye-type graphics reflecting the estimated location of each of the gunshots fired on July 9, 2014. The map also had a large circle representing a twenty-five meter margin of error, centered from the first shot fired. Greene explained that all twenty-three shots were within the twenty-five meter radius circle, and so "shot number 12 could have easily have been shot number 17 within the margin of error." (Tr. p. 266).

[13]     Samelton objected to the admission of Exhibit 101 by arguing, in part:

Our objection is to the attempt to extrapolate back the precise time of each shot and most particularly the location of each shot, because by doing so we have such a great margin of error in the scientific evaluation that it creates a situation where literally each of the gunshots is within the same area, and the margin of error essentially would place each gunshot anywhere within that circled area, and

consequently we have no assurance that shot number 1 wasn't really taken from location number 22 or that 21 was taken from location number 2.

So I think [] that's the problem right there. I think the [S]tate has failed to demonstrated that that process . . . meets scientific standards. . . . In essence, we're telling the jury we have an expert telling the jury that this is where the shots occurred, when in fact, he is not. He's saying, within this margin of error, any of these shots could have been taken from the location . . . .

[14] (Tr. pp. 273-74). After hearing Samelton's arguments and Greene's testimony regarding the Shot-Spotter system, the trial court overruled Samelton's objection to Exhibit 101, by stating, in part:

Looking at Rule 702 just on the face of the rule, [] scientific, technical, or other specialized knowledge would assist the tier of fact to understand the evidence or to determine fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of opinion or otherwise.

I think we have established that this witness has that kind of technical and specialized knowledge that he has accrued only in his current job [] and he certainly seems to have deep knowledge of science and math that I don't share but certainly explains it in a way that I feel that I'm understanding. . . .

I am satisfied with the scientific principles upon which the expert testimony based as reliable. . . .

And I think that the State's Exhibit 101 does provide the jury with the understanding that this is not a perfect science in the sense that, and maybe I'm using the word science wrong and maybe the system would be more accurate, and they cannot with a hundred percent accuracy to the centimeter determine the location of a shot when it has been fired, but I think this coupled with other evidence that's presented certainly tells me, one, that there is enough scientific principles to allow it, and two, that the prejudice of this information does not outweigh its

probative value. . . . . So I'm overruling the objections to both Exhibits 101, and 102.

(Tr. pp. 281-83).

[15] We find Samelton's argument insufficient to establish an abuse of the trial court's discretion in admitting Exhibit 101. In determining whether scientific evidence is reliable, the trial court must determine whether the evidence appears sufficiently valid, or, in other words, trustworthy, to assist the trier of fact. *Doolin*, 970 N.E.2d at 788. The trial court evaluated Greene's testimony at length, and it determined that the scientific principle or workings of the Shot-Spotter system were reliable in presenting evidence of a shooting at the gas station. The jury could have readily understood from Greene's testimony that all twenty-three shots were fired in the area roughly corresponding to the gas station's property. Accordingly, the jury was not presented with inaccurate information, but instead with a margin of error that allowed them to judge and weigh the persuasiveness of Exhibit 101.

[16] The State argues that, under the circumstances, however, any error in the admission of Exhibit 101 is harmless. It is well recognized that any error in admitting evidence will be found harmless where the evidence is merely cumulative. *Fuller v. State*, 674 N.E.2d 576, 578 (Ind. Ct. App. 1996). We note that the import of Exhibit 101 only corroborated that a shooting had occurred, and was merely cumulative to the following evidence: Garcia, the gas station attendant, testified that he saw the gunshots coming from the red sedan; Menyard was struck twice by bullets; the bullets and casing recovered at the gas

station matched the firearms recovered during the police investigation; and the gas station's surveillance video displayed the shooting.  In light of the foregoing, we conclude that trial court did not abuse its discretion in admitting Exhibit 101.

## II. *Attempted Voluntary Manslaughter Instruction*

[17]  Lastly, Samelton argues that the trial court abused its discretion when it denied his proposed jury instruction offering attempted voluntary manslaughter as a lesser included offense to the attempted murder charge.  In response to Samelton's assertion, the State argues that the trial court correctly determined that the evidence did not support the tendering of the instruction because there was no appreciable evidence of sudden heat.

[18]  In general, a trial court has complete discretion in matters pertaining to jury instructions.  *Driver v. State*, 760 N.E.2d 611, 612 (Ind. 2002).  In reviewing whether a trial court has abused its discretion by refusing to include a party's jury instruction, this court considers:  (1) whether the instruction correctly states the law; (2) whether the evidence supports giving the instruction; and (3) whether any other instructions cover the same substance as the excluded instruction.  *Id*.

[19]  In *Wright v. State*, 658 N.E.2d 563, 566-67 (Ind. 1995), our supreme court held that a trial court must give a tendered lesser included offense instruction if the alleged lesser included offense is either inherently or factually included in the crime charged and there is a serious evidentiary dispute about the element or

elements distinguishing the greater from the lesser offense such that a jury could conclude that the lesser offense was committed but the greater was not. Voluntary manslaughter is an inherently included offense of murder because it requires proof of the same material elements as murder. *See Champlain v. State*, 681 N.E.2d 696, 701-02 (Ind. 1997). This is true because voluntary manslaughter is murder with the mitigating factor that it was committed while acting under sudden heat. *Id.* For the same reasons, attempted voluntary manslaughter is an inherently included offense of attempted murder.

[20] Sudden heat has been defined as "sufficient provocation to excite in the mind of the defendant such emotions as anger, rage, sudden resentment, or terror, and that such excited emotions may be sufficient to obscure the reason of an ordinary man." *Fox v. State*, 506 N.E.2d 1090, 1093 (Ind. 1987). Sudden heat is not an element of voluntary manslaughter. *See Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002). Rather, it is that which distinguishes voluntary manslaughter from murder.

[21] Here, the question is whether there was appreciable evidence of sudden heat, and from the record, we find that there was no evidence of sufficient provocation nor was there any evidence that Samelton was in such a state of terror or rage that he became incapable of cool reflection. At the hearing, Garcia, the gas station attendant, testified that a red sedan drove into the pump area and without stopping, drove to front of the store entrance, and an individual inside the car pointed a gun out of the driver's side window and began firing. As Menyard walked out of the store, he was struck by gunfire.

Soon after, Garcia called 911, and while still on the phone, Garcia saw the red vehicle circle around the parking lot, drive back through the pumps, and over to west side of the store. Multiple shots were fired in sequence. As the red vehicle sped away from the scene, the patrons outside the gas station ran for cover. After the police arrived, Garcia showed them the surveillance videos which documented the shooting. In addition, the State published the gas station's surveillance videos to the jury. Furthermore, Greene, the forensic analyst, testified that the first shot was fired at 10:41:33 p.m. and the twenty-third shot was fired at 10:42:12 p.m. The incident lasted thirty-nine seconds.

[22] We find that the numerous shots, fired in rapid succession, revealed a deliberate attack on the persons at the gas station. Accordingly, we find that the evidence was not susceptible of an inference that Samelton was rendered incapable of cool reflection and deliberation. Because there was no evidence of sudden heat and no serious evidentiary dispute, the trial court did not abuse its discretion when it refused to tender Samelton's tendered instruction of attempted voluntary manslaughter.

[23] Moreover, we note that Samelton's attempted voluntary manslaughter instruction incorrectly stated the law. The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010). A trial court does not err by refusing an instruction that incorrectly states the law. *See McEwen v. State*, 695 N.E.2d 79, 84, n.1 (Ind. 1998).

[24] Sudden heat has been defined as "*sufficient provocation* to excite in the mind of the defendant such emotions as anger, rage, sudden resentment, or terror, and that such excited emotions may be sufficient to obscure the reason of an ordinary man." *Fox*, 506 N.E.2d at 1093. (emphasis added). Samelton's proposed instruction, by contrast, gave a definition of sudden heat without any reference to sufficient provocation. The State argues that by "failing to link the anger, rage, sudden resentment or jealousy to any action that constitutes provocation, the instruction could have confused the jury into thinking that any time a person acts out of such emotions, there is sudden heat even though there may not be any provocation." (Appellee's Br. p. 15) (quotation marks omitted). We agree. This court has held that "words alone will not constitute sufficient provocation." *See Supernant v. State*, 925 N.E.2d 1280, 184 (Ind. Ct. App. 2010), *trans. denied*. Because Samelton's tendered instruction used an incorrect definition of sudden heat, the trial court did not err in refusing it.

## CONCLUSION

[25] Based on the foregoing, we conclude that the trial court did not abuse its discretion by admitting Exhibit 101, or for refusing to instruct the jury on Samelton's proposed attempted voluntary manslaughter instruction.

[26] Affirmed.

[27] Kirsch, J. and Pyle, J. concur