

FILED

Nov 22 2023, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Paul J. Podlejski
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Zachary W. Hileman,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 22, 2023

Court of Appeals Case No.
23A-CR-518

Appeal from the Madison Circuit
Court

The Honorable Angela Warner
Sims, Judge

Trial Court Cause No.
48C01-2110-MR-2746

**Opinion by Judge Riley.**
Judges Crone and Mathias concur.

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Zachary Wayne Hileman (Hileman), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(1), and carrying a handgun without a license, a Class A misdemeanor, I.C. § 35-47-2-1.

We affirm.

## ISSUES

Hileman presents this court with two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by denying Hileman's proffered jury instructions on lesser-included offenses when the proposed instructions were not supported by the evidence presented; and

(2) Whether the trial court abused its discretion by admitting certain evidence indicating that Hileman was selling marijuana on the night of the murder.

## FACTS AND PROCEDURAL HISTORY

In the early morning of October 3, 2021, Shane Clark (Shane) was driving his vehicle in Anderson, Indiana, with his brother, Adrian Clark (Adrian), seated in the passenger seat and with Adrian's friend, Hileman, seated in the backseat behind Shane. After Hileman sold some marijuana at two separate residences and while he was arranging other potential marijuana sales that night through Facebook messages, Shane was driving in the vicinity of the intersection

between Broadway Street and East Webster Street, when he failed to yield the right of way and nearly collided with a motorcycle. Shane "stomp[ed]" on his brakes to avoid the collision and then continued driving. (Transcript Vol. I, p. 178). The motorcycle, ridden by Raymond Waymire (Waymire) with Jacklyn Jolliff as a passenger, swerved to avoid crashing into Shane's vehicle. After the near miss, Waymire circled around for a few blocks and caught up with Shane's vehicle at a stop sign. The motorcycle was loud and Waymire was driving pretty quickly to catch up with Shane's car.

[5] At the stop sign, Waymire parked his motorcycle on the side of the road and walked over to Shane's vehicle. Waymire approached Shane's window, which was cracked open slightly, and verbally confronted him about not yielding at the intersection. Shane, who mistakenly believed that Waymire had disregarded the stop sign, responded back. Waymire then approached the backseat window, which was rolled down. Shane and Adrian testified that Waymire leaned into the window and hit Hileman on the side of the face. Shane stated that he "heard the sound of something connecting" and Adrian noted that Waymire punched Hileman "in the middle, in the side of the face." (Tr. Vol. I, pp. 186, 237). Waymire then stepped back from the vehicle. Hileman exclaimed, "What the fuck. He hit me." (Tr. Vol. I, p. 188). Hileman took his gun which was lying next to him on the backseat and shot Waymire in the chest. The bullet pierced Waymire's heart, right lung, and pulmonary trunk. Waymire walked back to the motorcycle, fell to the ground, and was later declared dead at the scene. The entire interaction lasted

approximately six seconds. Immediately after the shooting, Shane drove away from the scene and took Hileman home.

[6] Hileman turned himself in less than twenty-four hours after the incident. Prior to turning himself in, Hileman sent Adrian messages via Facebook in which he urged Adrian to "say it was self-defense." (Tr. Vol. I, pp. 73-74). After being arrested and while he was incarcerated at the Madison County Jail, Hileman also had a phone conversation with Adrian in which he told Adrian that if the police talked to him again "make sure not to mention how [Waymire] stepped back and shit," and "if you could, man, mention that, that [Waymire] tried reaching for something in his pocket." (Exh. Vol. I, p. 70).

[7] On October 7, 2021, the State filed an Information, charging Hileman with murder, a felony, and carrying a handgun without a license, a Class A misdemeanor. From January 10 through January 13, 2023, the trial court conducted a jury trial. During his opening statement, Hileman's counsel advised the jury that Hileman had a difficult childhood, that he was small, and that he had been bullied. He informed the panel that

> twice in five or six months prior to the shooting, [Hileman] had been held at gunpoint. Beat and robbed. So he did what [] we hear[d] a lot of the p[ro]spective jurors have done. He armed himself with a handgun for personal protection.

(Tr. Vol. I, p. 98). Based on Hileman's counsel's statements of Hileman's claims of victimization and the need for self-protection, the State argued that he had opened the door for the admissibility of evidence that Hileman was dealing

marijuana on the night of the shooting. The trial court denied the State's argument, concluding that the "prejudicial value [of the marijuana dealing evidence] outweighs the probative value at this point," but cautioned that "if [Hileman] ends up testifying, I think we have a different issue on our hands given what was presented to the jury." (Tr. Vol. I, pp. 150-51).

[8] During the State's case-in-chief, the State sought to introduce images downloaded from Hileman's cell phone showing the firearm used in the shooting along with a large amount of currency, as well as some Facebook messages in which Hileman discussed drug dealing and carrying the firearm for protection while dealing. In one Facebook message dated the day before the incident, Hileman complained about losing his job but advised that he was now "trappin" and that he was safe because he "keep[s] a pole on me when . . . in traffic." (Exh. Vol. I, p. 93).[1] Another Facebook message dated from two hours before the shooting, in which Hilleman is "trynna get this bud gone," that "it's not bad gas," and explained the pricing. (Exh. Vol. I, p. 95).[2] A third Facebook message was a conversation with Shane a few hours before the shooting, in which Hileman was asking for a ride and offering to sell him some marijuana. The State argued that the messages were relevant to show that Hileman was not armed for a legal purpose and to establish his state of mind at

---

[1] A police officer translated that "trappin" referred to dealing drugs and that "pole" referred to a "gun . . . typically a handgun." (Tr. Vol. III, p. 65).

[2] "[B]ud" refers to marijuana and "gas" indicates the quality of the marijuana. (Tr. Vol. III, p. 66).

the time of the shooting. Hileman's counsel objected and claimed that the evidence was irrelevant, wildly speculative, and only intended "to try and dirty my client." (Tr. Vol. III, pp. 32-33, 37). The trial court admitted the photo of the handgun and the money, the Facebook message with Shane, and the Facebook messages explaining Hileman's reason to carry a handgun. The trial court denied admission of the remaining Facebook messages about drug dealing.

[9] After the State rested, Hileman commenced his defense. As part of his defense, Hileman's aunt, who was his adopted mother, testified that Hileman had been beaten up on two recent occasions, including one incident at a fair, after which Hileman required stitches. She informed the jury that after the second incident, she and her husband talked to Hileman about acquiring a handgun. Hileman testified in his own defense. During the State's cross-examination, Hileman acknowledged without objection that he was selling marijuana during the night of the shooting. As part of his questioning, the State offered into evidence additional Facebook messages in which Hileman was selling marijuana around the time of the incident, and which included a picture of his product. Hileman denied that the handgun was related to drug dealing and denied that his beating at the fair was related to him selling marijuana.

[10] After the presentation of the evidence, the parties addressed Hileman's request for jury instructions on the lesser-included offenses of voluntary manslaughter, reckless homicide, and criminal recklessness with a deadly weapon. While Hileman contended that there was evidence of sudden heat supporting the

proffering of a voluntary manslaughter instruction because he was "punched and embarrassed," the State objected and argued that Hileman had time for reflection after being punched. (Tr. Vol. III, p. 191). The trial court denied the proposed instruction on voluntary manslaughter:

> [T]he court really struggles to find that there's evidence that supports . . . sudden heat in this case, particularly in light of the defendant's testimony yesterday would give the court really no evidence that would indicate that that's what happened, that it was a sudden heat situation. [] [S]o the court's not giving the voluntary manslaughter in this case. The court doesn't believe the record supports the sudden heat or the voluntary manslaughter in this case.

(Tr. Vol. III, pp. 192-93). With respect to his proposed jury instructions for reckless homicide and criminal recklessness, Hileman pointed to his testimony that "his vision was affected, blurred, blacked out, he felt for the gun, raised it up and fired," as support for their proffer. (Tr. Vol. III, p. 197). The trial court denied these proposed instructions without explanation. After receiving the case and deliberation, the jury found Hileman guilty as charged.

[11] On February 7, 2023, the trial court sentenced Hileman to concurrent sentences of fifty years for murder and one year for carrying a handgun without a license.

[12] Hileman now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

I. *Proposed Jury Instructions*

[13] Hileman contends that the trial court abused its discretion when it refused to tender its proffered jury instructions on voluntary manslaughter, reckless homicide, and criminal recklessness with a deadly weapon. "The purpose of a jury instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Lawson v. State*, 199 N.E.3d 829, 838 (Ind. Ct. App. 2022). We review a trial court's jury instructions for an abuse of discretion. *Id*. On appeal, we review whether a tendered instruction correctly states the law, whether there is evidence in the record to support giving the instruction, and whether the substance of the instruction is covered by other instructions. *Id.* Instructional errors are harmless where a conviction is clearly sustained by the evidence and the instruction would not likely have impacted the jury's verdict, and we will reverse a conviction only if the appellant demonstrates that the error prejudiced his substantial rights. *Keister v. State*, 203 N.E.3d 548, 552 (Ind. Ct. App. 2023). In other words, an instructional error will result in reversal only when we "cannot say with complete confidence" that a reasonable jury would have returned a guilty verdict even if the instruction had not been given. *Id*.

[14] In *Wright v. State*, 658 N.E.2d 563 (Ind. 1995), our supreme court developed a three-part test that trial courts should perform when called upon by a party to instruct on a lesser-included offense to the crime charged. *See also Webb v. State*, 963 N.E.2d 1103, 1106 (Ind. 2012). First, the trial court must compare the statute defining the crime charged with the statute defining the alleged lesser-

included offense to determine if the alleged lesser-included offense is inherently included in the crime charged. *Wright*, 658 N.E.2d at 566. Second, if a trial court determines that an alleged lesser-included offense is not inherently included in the crime charged under step one, then it must determine if the alleged lesser-included offense is factually included in the crime charged. *Id.* at 567. If the alleged lesser-included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser-included offense. *Id.* Third, if a trial court has determined that an alleged lesser-included offense is either inherently or factually included in the crime charged, "it must look at the evidence presented in the case by both parties" to determine if there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater. *Id.* "[I]t is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense" if there is such an evidentiary dispute. *Id.*

A. *Voluntary Manslaughter*

[15] While both parties agree that voluntary manslaughter is the lesser-included offense of murder, the parties disagree on whether the evidence supported the proffering of the voluntary manslaughter instruction. *See Watts v. State*, 885 N.E.2d 1228, 1232 (Ind. 2008) (voluntary manslaughter is an included offense of manslaughter). Although voluntary manslaughter is a lesser-included offense of murder, it is not a typical lesser-included offense, because instead of requiring

the State to prove less than all the elements of murder, it requires the State to prove all of the elements of murder and to disprove the existence of sudden heat when there is any appreciable evidence of such in the record. *Roberson v. State*, 982 N.E.2d 452, 457 (Ind. Ct. App. 2013). Additionally, a conviction for voluntary manslaughter constitutes an acquittal of murder. *Id.* The absence of sudden heat is not an element of murder, and a jury ordinarily does not have to be instructed that the State has the burden of disproving the existence of sudden heat in order to gain a murder conviction. *Massey v. State*, 955 N.E.2d 247, 255 n. 4 (Ind. Ct. App. 2011). If, however, the record contains any appreciable evidence of sudden heat, an instruction on voluntary manslaughter is justified. *Roark v. State*, 573 N.E.2d 881, 882 (Ind. 1991). Additionally, such evidence may arise from either the State's or the defendant's evidence; the defendant does not bear the burden of placing the issue of sudden heat into question. *Dearman v. State*, 743 N.E.2d 757, 761 (Ind. 2001).

[16] "'Sudden heat' is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." *Suprenant v. State*, 925 N.E.2d 1280, 1282 (Ind. Ct. App. 2010), *trans. denied*. Words alone do not constitute sufficient provocation to warrant a jury instruction on voluntary manslaughter, especially when the words were not intended to provoke the defendant, such as fighting words. *Id*. Additionally, any alleged provocation must be such that it would obscure the reason of an "ordinary man," which is an objective as opposed to a subjective standard. *Id*.

at 1282-83. Unlike the right to self-defense, which ceases to exist once a danger has passed, "sudden heat can survive for a while beyond the act of provocation." *Roark*, 573 N.E.2d at 883.

[17] Here, we cannot say that the incident prevented deliberation and rendered Hileman incapable of cool reflection. *See Suprenant*, 925 N.E.2d at 1282. Testimony reveals that Waymire's motorcycle was loud and revving while trying to catch up with Shane's vehicle after the near collision. After catching up with Shane's car at a stop sign, Waymire parked his motorcycle and walked over to the vehicle. The three occupants of the car noticed Waymire approaching. While Waymire was confronting Shane, and while Hileman felt "scared the whole time once [he] seen [sic] him get off the bike," Hileman did not close the car's window but instead left it open. (Tr. Vol. III, p. 130). After confronting Shane verbally, Waymire moved to the open passenger side window, which was where Hileman was sitting. According to Shane, Adrian, and Hileman, Waymire reached into the window and struck Hileman on the side of the face. Waymire then stepped back from the vehicle. Hileman exclaimed, "What the fuck. He hit me," and only then took the gun which was lying next to him on the backseat and shot Waymire in the chest. (Tr. Vol. I, p. 188).

[18] This is not a situation where Hileman was unapprised of the developing situation. He heard the motorcycle approach, he noticed Waymire walk up to the vehicle, and he saw Waymire verbally accost Shane. *See id*. at 1284 ("words alone [will not] constitute sufficient provocation"). Despite claiming to be in

fear, Hileman did not close his window. Yet, it was not until Waymire punched Hileman, stepped back, and Hileman realized that he had been punched, that finally Hileman reached for his weapon and fatally shot Waymire. Although the entire encounter lasted a mere six seconds, the sequence of events allowed Hileman time to make a deliberate decision to reach for his weapon and to shoot Waymire. We have previously found that efforts to retrieve a weapon prior to killing reflects that the defendant was "capable of deliberation and cool reflection." *Santana v. State*, 688 N.E.2d 1275, 1279 (Ind. Ct. App. 1997) (Santana retrieved weapon from his home before shooting). While in *Santana*, the premeditation lasted approximately thirty minutes for Santana to retrieve his weapon and shoot the victim, our supreme court has recognized that premeditation—"the deliberate formation of an intent to perform a future act,"—"may be as instantaneous as successive thoughts," and the precise duration between the inception of intent and the killing "need not be appreciable to constitute premeditation." *Carmack v. State*, 200 N.E.3d 452, 459-60 (Ind. 2023). Here, the escalating nature of the situation afforded Hileman time for "cool reflection." *See Suprenant*, 925 N.E.2d at 1282. Accordingly, we conclude that a voluntary manslaughter instruction was not supported by the evidence and was properly refused by the trial court.

B. *Reckless Homicide and Criminal Recklessness with a Deadly Weapon*

[19] Focusing on the *mens rea* element of reckless homicide and criminal recklessness with a deadly weapon, Hileman contends that the trial court abused its discretion in refusing to tender these instructions because "[i]t is reasonably

plausible that the jury could have found that Hileman never intended to kill the victim; that he only intended to use lesser than deadly force, or [to] scare Waymire away." (Appellant's Br. p. 22).

[20] Reckless homicide and criminal recklessness require a reckless *mens rea*, while murder requires a knowing or intentional *mens rea*. *Griffing v State*, 963 N.E.2d 685, 691 (Ind. Ct. App. 2012). I.C. §§ 35-42-1-1 (murder), -5 (reckless homicide), -2-2 (criminal recklessness). As the only difference between reckless homicide and murder is the *mens rea* element, reckless homicide is an inherently included offense of murder. *Heavrin v. State*, 675 N.E.2d 1075, 1079 (Ind. 1996). Likewise, as the "culpability [is] the sole distinguishing element," criminal recklessness is an inherently lesser-included offense of murder. *Hamilton v. State*, 783 N.E.2d 1266, 1269 (Ind. Ct. App. 2003), *trans. denied*.

[21] In *Webb v. State*, 963 N.E.2d 1103, 1108 (Ind. 2012), our supreme court determined that the trial court abused its discretion by refusing to give the proposed reckless homicide instructions because there was a serious evidentiary dispute as to whether the defendant acted knowingly or recklessly as evidence had been admitted that the gun used to shoot the victim had been unloaded at different points in the evening, and that individuals had been playing with the gun before the victim was shot. In *Fisher v. State*, 810 N.E.2d 674, 680 (Ind. 2004), the court concluded that the jury should have been instructed on reckless homicide where the victim was shot once and there was evidence that the defendant was playing around with the gun.

Here, the evidence reflects that Hileman shot Waymire through the heart after Waymire had stepped away from the car. Hileman claims that his vision was blurry, that he did not have time to aim the gun, and that he just fired in the direction of Waymire and did not know if he hit him or not. A person "'knowingly'" kills when he is 'aware of a high probability' that his conduct might kill." *Jones v. State*, 966 N.E.2d 1256, 1258 (Ind. 2012). The "protracted nature" of shooting someone at close range could not have occurred "without an awareness that his actions could result in [] death." *Id. See also, McEwen v. State*, 695 N.E.2d 79, 85-86 (Ind. 1998) (reckless homicide instruction properly denied when victim was stabbed in the chest one time, piercing the heart because a stabbing near the heart allows an inference of knowing or intentional killing). Unlike *Webster* and *Fisher*, there is no evidence suggesting that Hileman thought the gun was unloaded or that he somehow lacked the knowledge that his actions could kill Waymire. Based on the facts before us, Hileman's conduct point towards a knowing or intentional killing, and the trial court properly refused to instruct the jury on the lesser-included offenses of reckless homicide and criminal recklessness.

II. *Admissibility of Evidence*

Next, Hileman contends that the trial court abused its discretion by admitting "evidence regarding [Hileman] selling marijuana." (Appellant's Br. p. 22). We review a trial court's decision on the admission of evidence for an abuse of the trial court's discretion. *Eaton v. State*, 111 N.E.3d 1039, 1043 (Ind. Ct. App. 2018). We will reverse "only where the decision is clearly against the logic and

effect of the facts and circumstances." *Id.* We do not reweigh the evidence and consider conflicting evidence in a light most favorable to the trial court's ruling. *Id.*

[24] Focusing on Evidentiary Rules 403 and 404(b), Hileman contends that the "repetitious drumbeat of testimony and comments regarding [his] involvement in the sale of marijuana and its prejudicial effect," served to impress on the jury that Hileman's involvement with the sale of marijuana would "naturally give rise to the inference that [he] is of bad character." (Appellant's Br. pp. 23,24). Hileman further argues that the "onslaught of [evidentiary] harpoons" during the State's closing argument served as the "proverbial 'nail in the coffin[,]'" as its probative value was far outweighed by the prejudicial effect it served. (Appellant's Br. pp. 24-25).

[25] "An evidentiary harpoon occurs when the State deliberately places inadmissible evidence before the jury to prejudice the jurors against the defendant." *Turner v. State,* 216 N.E.3d 1179, 1184 (Ind. Ct. App. 2023). However, the State's closing argument referred to statements and evidence that had been admitted by the trial court during the course of the proceedings. As such, the principle of the evidentiary harpoon is inapplicable because the evidence was presented to the jury with the approval of the trial court. Besides the generalized statements of the perceived existence of evidentiary harpoons, Hileman fails to direct this court to any specific instances of alleged improper admission of the evidence by the trial court and he fails to develop his argument with specific citations to the record. "The purpose of our appellate rules, Indiana Appellate Rule 46 in

particular, is to aid and expedite review and to relieve the appellate court of the burden of searching the record and briefing the case." *Miller v. Patel*, 212 N.E.3d 639, 657 (Ind. 2023). We will not step in the shoes of the advocate and fashion arguments on his behalf. *Id*. "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research," but instead are tasked with solving disputes "as arbiters of legal questions presented and argued by the parties before them." *Id.* (citing *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)). "We do not exist to answer every legal question that may exist in the ether; rather, we resolve concrete issues properly tested through the adversarial process: adequate and cogent briefing is required for that process to live up to its potential." *Id*. Accordingly, as Hileman fails to present us with a cogent argument pursuant to Indiana Appellate Rule 46(A)(8), he has waived the issue for our appellate review.

## CONCLUSION

Based on the foregoing, we hold that the trial court did not abuse its discretion by denying Hileman's proffered jury instructions on lesser-includedoffenses. Additionally, Hileman waived review of the admissibility of certain evidence by failing to present a cogent argument.

Affirmed.

Crone, J. and Mathias, J. concur